[Civ. No. 20938. First Dist., Div. Two. Nov. 27, 1963.]

HOWARD C. PLATT et al., Plaintiffs and Respondents, v. WELLS FARGO BANK AMERICAN TRUST COMPANY, as Coexecutor, etc., et al., Defendants and Appellants.

Paul I. Myers, Jr., David C. Dunlap and Pillsbury & Dunlap for Defendants and Appellants.

Bronson, Bronson & McKinnon, Ropers, Majeski & Phelps and Harold R. McKinnon for Plaintiffs and Respondents.

AGEE, J.—The trial court impressed a trust in favor of plaintiffs upon certain corporate stock. Defendants have appealed, contending that such relief is barred by the defense of illegality and unclean hands. The facts will be stated in the light most favorable to respondents.

Gladys Platt Pendleton executed her last will on October 15, 1949. After providing for certain specific bequests, the residue was left to her husband, Louis L. Pendleton, and her nephew, Howard C. Platt, in equal shares.

The residue consisted almost entirely of stock in the Folger

Coffee Company, which had come to Mrs. Pendleton by inheritance. She wanted all of it to go to her nephew and his children, thus keeping it in what she referred to as the "Platt Blood Line." The will did not express this wish. The reason therefor follows.

In 1949, Mrs. Pendleton had directed her attorney, Herbert E. Wenig, to prepare a new will. While Wenig was in the process of doing so, Pendleton happened to receive a pamphlet distributed by a New York bank. It discussed the new marital tax deduction provided for in the Federal Revenue Act of 1948. He took this to Wenig's office and asked him about the advisability of drafting the will with this deduction in mind. Wenig told him that he would look into the matter.

Under the provision in question, up to one-half of a deceased spouse's estate is exempt from federal estate tax if it is left to the surviving spouse either outright or, if such portion is left in trust, the surviving spouse is entitled to all the income for life and has an unrestricted power of appointment.

Wenig reached the conclusion that, so long as any limitations or restrictions on the bequest of the Folger stock to Pendleton did not emanate from Mrs. Pendleton, Platt and Pendleton could make any agreement that they wanted to as between themselves with respect to the property being bequeathed to them, and that such an agreement would not affect the right to the marital deduction.

Wenig so advised all of the parties and Mrs. Pendleton expressed herself as being willing to rely upon Pendleton to carry out her wishes. Pendleton assured her that he would do so. Pendleton and Platt both knew what these wishes were, having discussed them with her on many occasions.

Mrs. Pendleton then executed the will of October 15, 1949, naming Pendleton and Platt as executors. Later, on the same day, Pendleton and Platt made a written agreement between themselves that all of the residue distributed to them would be placed in an irrevocable trust with themselves as trustees; that two-thirds of the net annual income from the trust estate would go to Pendleton and one-third to Platt; that on Pendleton's death, the trust would terminate as to two-thirds of the corpus, which would then go to Platt, and the other one-third of the corpus would remain in trust, with Platt's two children as the beneficiaries.

This agreement is sometimes referred to herein as the "trust agreement." Wenig had prepared the will and the

agreement and had advised Pendleton and Platt that the arrangement provided for therein was perfectly legal and proper and would still allow Pendleton to claim the marital deduction for the purpose of the estate tax. Pendleton and Platt both accepted this advice and relied upon it in good faith.

Pendleton and Platt also made another agreement at the same time. This referred to a parcel of commercial realty held in joint tenancy by Mrs. Pendleton and Pendleton. This property had been purchased with Mrs. Pendleton's funds and Pendleton agreed that, upon her death, he would convey a one-third interest therein (except a designated portion of the southwest corner) to Platt.

Later, Mrs. Pendleton expressed the wish that, upon Pendleton's death, this entire parcel (less the excepted portion) should go to Platt. Pendleton agreed to this but it was not put in writing until January 6, 1950, shortly after Mrs. Pendleton's death. This agreement provided that, when Pendleton received the property as the surviving joint tenant, he would convey it (less the excepted portion) to Platt in trust, Platt to pay him two-thirds of the net annual income therefrom and the trust to terminate upon Pendleton's death. On November 1, 1951, Pendleton executed and delivered a deed of said property to Platt.

The agreements and the deed were intended by Pendleton and Platt to carry out the desires of Mrs. Pendleton with respect to the Folger stock and the commercial real property.

Mrs. Pendleton died on January 3, 1950. Pendleton and Platt employed Wenig as the attorney for the estate and the will of October 15, 1949 was admitted to probate on February 3, 1950.

During the course of administration, Wenig prepared the federal estate tax return. Schedule M of the return related to the claim of marital deduction. Question 5 thereof reads as follows: "According to the information and belief of such person or persons, has any person other than the surviving spouse asserted (or is such assertion contemplated) a right to any property interest listed on this schedule, other than as indicated under questions (1) and (4)?"

Wenig inserted the answer "No" to this question. He testified that he did so because the agreement between Pendleton and Platt "in no way reduced the interest which Colonel Pendleton received from Mrs. Pendleton's estate. The agreement, in my opinion, created no interest which would be

subject to the probate of the estate. I had given careful consideration to the matter at the time of drafting the agreement and checked the authorities and, in my opinion, it created an interest in both Howard [Platt] and the Colonel [Pendleton] only after distribution but ... it did not create any interest at the time or during the course of probate.''

Wenig executed the ''Affidavit of Attorney'' attached to the return, in which he avers that the return ''is a true, correct, and complete statement of all the information respecting the estate tax liability of this estate of which I have any knowledge.'' Pendleton and Platt thereafter signed the return as executors, relying upon Wenig for its accuracy.

The estate was distributed on January 9, 1952, and Pendleton and Platt received the Folger stock in equal shares. Wenig had advised them that the execution of any formal trust agreement would have to await actual distribution. Such an agreement was never executed. While the record is replete with the causes for the many delays, it is unnecessary to go into detail here. Appellants concede that they ''do not question the ultimate decision of the trial court on the issue of limitations and laches.''

Pendleton and Platt worked out an interim arrangement for the disbursement of income, payment of taxes, etc., and Platt rendered annual statements to Pendleton for the years 1952 through 1958.

However, the whole matter was brought to a head by a letter from Pendleton's attorney to Wenig, dated May 5, 1959, denying any *legal* obligation on the part of Pendleton to carry out the trust agreement. The letter states that Pendleton was willing to maintain his will bequeathing the Folger stock which he had received from his wife's estate to Platt and his children ''on the condition that Howard Platt agrees to maintain his income payments to Col. Pendleton and that Mr. Platt cease trying to *force* Col. Pendleton to place his property in a trust.'' (Italics added.)

Platt thereupon retained present counsel who, on September 28, 1959, wrote to Pendleton's attorney as follows: ''Unless a trust agreement in substantially the form set forth in the enclosure is executed on or before the 2nd day of November, 1959, we will commence litigation to enforce the rights of Mr. Platt and his two minor children.'' The agreement was not executed.

On November 4, 1959, Platt and his two children commenced this action to impress a trust upon the stock. They

also sought to impress a trust upon the Pendleton home property.

On May 3, 1960, Pendleton filed an answer, affirmatively alleging that the agreement between himself and Platt was illegal and unenforceable since the sole purpose thereof was the unlawful and fraudulent evasion of federal estate taxes. By way of cross-complaint, Pendleton sought to cancel his deed of the commercial property to Platt on the ground of undue influence by Platt.

Pendleton died on November 23, 1960, and the executors of his estate were substituted for him. His deposition was read at the (nonjury) trial.

Judgment was rendered in favor of respondents as to the stock but against them as to the home property. Appellants were denied a cancellation of the deed to the commercial property. The home property is not included in this appeal, respondents not having cross-appealed.

Appellants' main contention on appeal is that the trust agreement is illegal and therefore unenforceable because it was entered into with the intent and for the purpose of defrauding the federal government of a portion of the federal estate taxes.

There is no doubt that the objective of the parties in entering into the agreement was to obtain the marital tax deduction, while still carrying out Mrs. Pendleton's wishes with respect to the disposition of the Folger stock. As an abstract matter, this is not an illegal objective.

Likewise, as an abstract matter, it is not illegal for the beneficiaries under a will to make an agreement between themselves as to how they will dispose of their respective legacies when received by them.

However, if Pendleton and Platt entered into the trust agreement with the intent of fraudulently concealing its existence from the federal government for the purpose of obtaining the marital tax deduction, the agreement is illegal and unenforceable. (12 Cal.Jur.2d, Contracts, "Effect of Illegality," § 98, p. 297.) The result would be the same under the clean hands doctrine. (18 Cal.Jur.2d, Equity, "Doctrine of Clean Hands," § 28, p. 183.)

"Intent" and "purpose" are ordinarily questions of fact to be determined by the trial court. As stated in *Boericke* v. *Weise*, 68 Cal.App.2d 407, 418 [156 P.2d 781]: "Whether plaintiffs are within the application of the maxim [unclean hands] is primarily a question of fact."

The trial court made findings of fact from which it

concluded that neither Mrs. Pendleton, Pendleton, nor Platt acted with any fraudulent intent or purpose and that they relied upon the advice of counsel that what they were doing was in all respects legal and proper.

These findings are supported by substantial evidence and are quite detailed. The substance thereof, as to Platt, is that he was first told of the marital deduction provision on October 10, 1949; that Wenig advised him that this deduction could be claimed and Mrs. Pendleton's wishes as to the disposition of her property could also be carried out if he and Pendleton would execute an agreement providing therefor, after Mrs. Pendleton had signed the will which Wenig was then drafting; that Platt did not at any time have the intent or purpose to fraudulently evade taxes; that he relied and acted upon the advice of Wenig that the proposed arrangement was legal and proper; that after Mrs. Pendleton's death, as coexecutor of her estate, he signed the federal estate tax return in reliance upon the advice of Wenig and without any knowledge that there was or might be any false representation contained therein.

Appellants state that they "do not question the trial court's finding of good faith, ..." This is, of course, merely an acknowledgment of the rule that an appellate court will not overturn a finding of fact based upon substantial evidence.

Appellants say that it "is immaterial" that "[t]he trial court found that the parties acted in good faith on advice of counsel and did not intend to violate any law." This is so, appellants assert, because "[t]he tax evasion scheme *necessitated* a concealment of the true facts." (Italics ours.)

Respondents point out the inconsistency between appellants' concession as to "good faith" and the charge of "concealment." However, what appellants probably mean to contend is that Wenig's legal opinion as to the right to the marital deduction under the arrangement set up by him is completely worthless and without any legal merit whatsoever; that the object of the trust agreement could therefore only be accomplished by failing to disclose its existence to the federal government; that if the federal government had been advised of the agreement between Pendleton and Platt, there could not be even the slightest doubt that the marital deduction would have been denied.

Appellants make no contention that Wenig acted in bad faith in rendering his opinion to the Pendletons and to Platt.

The merit of this opinion is not an issue to be determined by us. The record does not disclose what position the federal government intends to take in this matter, although it was given full notice of this action at the commencement thereof.

Pendleton and Platt left the handling of the marital tax deduction up to Wenig. If it was allowed, so much the better. If it was disallowed, the increased estate tax would have to be paid out of Mrs. Pendleton's estate. Her will contained the express provision that "all federal estate taxes ... shall be paid out of the residue of my probate estate."

The performance of the trust agreement by the parties was not made dependent or contingent upon the allowance or disallowance of the marital tax deduction. It is perfectly clear that the parties intended to and did bind themselves with respect to the ultimate disposition of the Folger stock, regardless of the outcome of the tax deduction claim.

■ Where an agreement (to claim a tax deduction) does not require the parties to do anything illegal in performing it, the good faith of such parties becomes of great importance if, in fact, such agreement is performed in an illegal manner.

In *Du Pre* v. *Bogumill*, 173 Cal.App.2d 406, the court stated, at page 413 [343 P.2d 415]: "The defendant engaged the attorney to draft the documents and to advise them with reference to the transaction and plaintiff relied upon the representations of the attorney that the contract and the proceeding were proper and plaintiff conducted himself at all times as requested by the defendant. No bad motive and no intent to violate the law appears in anywise upon the part of the plaintiff."

■ The court quotes with approval from 12 California Jurisprudence 2d section 69, page 272, as follows: "If an agreement which does not provide for a method of accomplishing its purpose can be accomplished by any legal method, it must be assumed that such method was contemplated when the contract was made and will be pursued, and it will not be presumed that the parties intended to perform in an illegal manner. ■ Moreover, where a contract can be performed in a legal manner as well as in an illegal manner, it will not be declared void because it was in fact performed in an illegal manner."

However, this last principle does not apply where the one seeking to enforce the contract participates in the illegal preformance.

■ Assuming that Wenig's failure to inform the federal government of the trust agreement amounted to fraud, this does not make Platt a participant therein. The trial court expressly found that Platt had no notice or knowledge of any illegality or impropriety in connection with the filing of the federal estate tax return; that he signed the return as coexecutor in reliance upon the advice of counsel that it was in all respects properly filled out; that said counsel was the same counsel who had prepared the will of October 15, 1949 and the trust agreement executed on the same day; that Platt did not attempt to use any transactions involved herein "as a coverup device to conceal facts or to carry out any scheme to evade taxes in the estate of Mrs. Pendleton. . . .''

These findings are supported by substantial evidence. In our opinion, the trial court's rejection of the defenses of illegality and unclean hands should be upheld.

■ As to appellants' contention that Platt exercised undue influence upon Mrs. Pendleton and Pendleton, this merely presents a question of fact which was resolved by the trial court adversely to appellants.

Appellants rely upon the familiar rule that when a confidential relationship exists and the party in whom confidence is reposed obtains some benefit, there is a presumption of undue influence.

However, this presumption is rebuttable and the trial court made detailed findings of fact which completely exonerated Platt from such charge, including the following finding: "[P]laintiff Platt did not exercise any undue influence over Mrs. Pendleton or defendant Pendleton or exercise any control or dominion over Mrs. Pendleton or defendant Pendleton at any time whatever in respect to any matter whatever." These findings are supported by substantial evidence.

■ Appellants next assert that the trust agreement did not provide for "a definitely ascertained trust corpus" and that the parties should not have been "left free to determine by their own [subsequent] agreement what should constitute the corpus of the constructive trust. . . .''

At the time of the execution of the agreement, Pendleton and Platt knew that Mrs. Pendleton's will provided that the residue of her estate was to go to them. They knew that the Folger stock was included in such residue. This stock represented practically the entire estate subject to probate and it was the only asset expressly referred to in the trust agreement.

Pendleton and Platt did not know at the time, of course, that the Folger stock was to be the only asset left in the residue to distribute. For this reason, the trust agreement provided that the trust was to consist of "all the residue distributed to them, ..." We think that the trust residue was sufficiently identified by the trust agreement.

■ After distribution of the specific bequests there remained some miscellaneous stock and cash which Pendleton and Platt accepted as their executors' fee. This left only the Folger stock in the residue.

In order to distribute this residue, it was necessary to raise $10,000 to pay the inheritance tax due to the State of California. Mrs. Pendleton's will provided that the inheritance taxes should be paid out of the residue of her estate. However, Pendleton and Platt decided to borrow the money rather than sell any of the Folger stock. They obtained an order from the probate court authorizing them, as executors, to borow the $10,000 from a bank and to pledge Folger stock as security.

After the loan was made, Pendleton and Platt petitioned the probate court for final distribution. The bank released the estate from its obligation and Pendleton and Platt, as distributees of the residue, assumed the loan. (It was later paid off out of cash dividends from the Folger stock.)

On January 9, 1952, pursuant to their petition, the probate court distributed all of the Folger stock to Pendleton and Platt. The trial court in the instant action determined that an enforceable constructive trust as to all of this stock thereupon came into existence. Prior to that, there had only been an agreement to create a trust upon the distribution of the estate.

The distribution was also subject to federal estate taxes which, on May 12, 1953, were assessed at approximately $15,000. Pendleton and Platt, as individuals, thereupon borrowed this additional amount from the bank, again pledging Folger stock. This loan was also paid back out of Folger dividends.

Despite the foregoing, appellants make the contention that the corpus of the trust should be reduced by the number of shares of stock that would have had to have been sold in order to pay off the state inheritance tax and the federal estate tax.

The answer to this contention is clear. Pendleton wanted to carry out his wife's wishes that her Folger stock be preserved for the "Platt Blood Line." In all of her prior wills

and in her discussions concerning her estate, she had made it evident that this wish was uppermost in her mind. She was proud of the part that her father had played in the founding of the Folger Coffee Company. He was its vice-president at the time of his death in 1919. Pendleton knew that his wife was dying of cancer and that she trusted him to carry out her wishes. And for a period of years after her death he did so. The repudiation came later.

Aside from this aspect, Pendleton was faced with a matter of business judgment. Folger stock was not listed on any exchange and it was seldom traded. The selling price would have been uncertain. Any sale of the stock would reduce his two-thirds share of the dividends accordingly.

The controlling factor is that Pendleton freely and voluntarily chose to handle the tax payments as he did. Having done so, his successors in interest cannot now go back and attempt to show that they would be better off financially if Pendleton had elected to sell stock instead of using it for collateral on the bank loans.

Appellants next assert that certain other Folger stock should not be included in the trust. Mrs. Pendleton's will provided that "all income received during the first year of probate" should be paid to Pendleton.

During this period a stock dividend of 4,200 shares was declared on the Folger stock. Appellants contend that 5 per cent of these shares should be treated as income and are therefore free and clear of the trust.

Appellants rely upon the provision in the October 15, 1949, agreement between Pendleton and Platt that '[f]ive per cent of all stock dividends shall be treated as income." However, there is no provision in Mrs. Pendleton's will directing that any portion of a stock dividend should be allocated to income. So far as the will is concerned, the applicable law is that shares of the declaring corporation of the same kind and rank as the shares on which such dividend is paid shall be deemed principal and not income. (Civ. Code, §§ 730.07, 730.02.)

The provision in the will for payment of income and the provision in the agreement for allocation of stock dividends to income are completely separate and independent.

Income under an *inter vivos* trust does not commence *until* such trust becomes effective, unless there is some provision in the trust agreement to the contrary. (3 Scott on Trusts (2d ed.) § 234, p. 1777; *Jacks* v. *Monterey County*

*Trust & Sav. Bank,* 20 Cal.2d 494, 499-501 [127 P.2d 532].) There was no such contrary provision herein.

The trust became effective upon the distribution of Mrs. Pendleton's estate and all stock dividends declared *thereafter* were allocated between principal and income in accordance with the trust agreement. The shares so allocated to Pendleton as income were not included in the constructive trust.

Appellants close with the contention that the ultimate tax responsibilities to the federal and state governments should have been adjudicated by the trial court. We do not agree. Neither government is a party herein and neither would be bound by any such adjudication. The record does not disclose whether any additional taxes have been levied or what the amount and basis thereof will be, if levied.

Equity's responsibility to determine all actual controversies between the parties does not mean that it must adjudicate conjectural or premature matters which do not constitute actual and present controversies; nor does it mean that the court should attempt to resolve controversies in the absence of indispensable parties. (*Young* v. *Young,* 100 Cal. App.2d 85, 86 [223 P.2d 25]; *People* v. *Collins,* 97 Cal.App. 2d 552, 553-554 [218 P.2d 87].)

As we have stated above, the primary issue in this case is whether the parties acted in good faith and on the advice of their counsel in attempting to obtain the marital tax deduction. On the basis of substantial evidence, the court determined the issue in favor of respondents.

The judgment is affirmed.

Shoemaker, P. J., and Taylor, J., concurred.

A petition for a rehearing was denied December 17, 1963, and appellants' petition for a hearing by the Supreme Court was denied January 22, 1964.