[Civ. No. 35162. Second Dist., Div. One. July 8, 1970.]

CYRUS J. LANGFORD et al., Plaintiffs and Respondents, v. HERBERT L. ECKERT, Defendant and Appellant.

440

## COUNSEL

Klinger & Leevan and Paul S. Leevan for Defendant and Appellant.

George R. Maury for Plaintiffs and Respondents.

## OPINION

**LILLIE, J.** — By their amended complaint, and a supplement thereto, based on a series of common counts (three causes of action), plaintiffs sought recovery of installment payments made by them on a promissory note to a banking institution which they allege should have been made by defendant as co-signer. In a court trial they were given judgment for $6,336 plus interest ($683.76) and defendant was ordered to make payments to the bank in question until the loan was paid in full. Defendant appeals from the judgment.

Defendant, a practicing physician, is the former husband of plaintiffs' daughter.[1] In June of 1962, after separation from active service with the United States Navy at Point Hueneme, he and his wife, together with their four chlidren, took up temporary residence with plaintiffs at the Langford home in Sherman Oaks. Valued in excess of $46,000, with three bedrooms, library, living room and dining room, it was owned by plaintiffs free and clear of all encumbrances. Shortly after such temporary residence was established, defendant having in the interim planned to do research work (with a limited salary) at a local university, conversations took place to the end of allowing defendant and his family to remain there permanently; more specifically they related to the construction of improvements or additions sufficient to accommodate all the members of both families. To finance these improvements consideration was given to a construction loan from Security First National Bank. There is a conflict in the testimony as to what thereafter occured. Mr. Langford stated that defendant discussed with the architect, to whom the plans were taken, the particular improvements he desired, two of which were a Japanese (soaking) tub to be installed upstairs and a curved ceiling in the family room for hi-fi reception; according to Mr. Langford, defendant also discussed estimates and costs with the contractor who had been contacted. Defendant, on the other hand, testified that the plaintiffs took care of all the above specific dealings; that he never spoke to the architect, the contractor or subcontractors; that he told plaintiffs he could only afford payments of $150 per month on any installment note; and that plaintiffs told him not to worry because their home, with its proposed improvements, would eventually be his and his wife's upon plaintiffs' deaths.

Eventually plaintiffs applied for the construction loan, their application showing a net worth of $131,000. The loan was granted; thereafter, on July 12, 1962, plaintiffs executed a promissory note in favor of the bank in the principal sum of $24,500 with interest at 6 percent, secured by a first trust deed on their residence and repayable in monthly installments of $176 commencing August 12, 1962. Defendant and his wife co-signed the note at plaintiffs' request.

In this latter regard, it appears that Mr. Langford previously expressed some hesitancy about applying for the loan in the first instance. He told defendant, " '[S]uppose you leave and got a job somewhere else and decided you wanted to leave, I would be stuck for the payments for this house, and I am ready to retire. I don't want to start meeting payments.' " To this defendant replied: " 'There is no chance for that. I will sign the note so I can't

---

[1]Also named as a defendant, plaintiffs' daughter was never served with process nor made any voluntary appearance in the proceeding.

leave it. I will take out insurance on it so that if anything happens to me, the note, the payments will go on.' " These statements, Mr. Langford testified, "convinced me that he meant it, . . . I liked it, and I fell for it, and agreed to do it."

From the loan proceeds, two bedrooms, a bath and a large family room were constructed as an addition to the house; the cost thereof amounted to $29,500, some $5,000 more than was borrowed. Defendant and his family immediately moved into their "quarters" upon their completion in the spring of 1963. He or his wife made the stipulated payments on the note for 35 months (from October 15, 1962, until August 15, 1965), representing a total expenditure of $6,160. Before the last few payments were made, however, on March 25, 1965, defendant moved from the premises, as did his wife and children a few days later when she instituted divorce proceedings, the last payments being paid by Mrs. Eckert from the child support she received from defendant. (A final judgment of divorce was entered in October of 1968.) Plaintiffs testified that since August of 1965 they have paid all the installments due on the note.

We first discuss defendant's contention that the judgment, although not expressly so stating, was erroneously predicated on *quantum meruit,* one of the several forms of assumpsit ordinarily referred to as common counts. But in addition to the quantum counts, the old action of assumpsit includes money counts—"for money lent, for money paid, laid out, and expended, and for money had and received." (5 Cal.Jur.2d Rev., Assumpsit, § 14.) Accordingly, "An action for money paid may be maintained by a person who is legally compelled to pay money which another is under legal obligation to pay, or who, to relieve himself from liability or to save himself from damage, pays money, not officiously, which another person ought to have paid." (*Supra,* § 17.) Cited for the foregoing statement is *Pioneer Title Ins. Co.* v. *Guttman,* 175 Cal.App.2d 116 [345 P.2d 577], which in turn refers (at p. 120) to *Weaver* v. *Fickett,* 82 Cal.App. 116 [255 P. 257], which states at pages 120-121: " 'One who is compelled, by reason of a legal liability therefor, to pay an obligation for which another in equity and good conscience should pay, may recover from that other the money so paid. It is not necessary that the payment should have been coerced by actual legal proceedings; the mere existence of the legal liability is sufficient.' [Citation.]" To the same effect is *Page* v. *Podol,* 4 Cal.App.2d 229 [41 P.2d 167], containing a quotation at page 231 from *Finnell* v. *Finnell,* 159 Cal. 535, 539 [114 P. 820]: "The soundness of this doctrine has been upheld by innumerable decisions of courts of the highest authority in many jurisdictions, and it is so obviously just and reasonable that it is matter of wonder that it should ever have been called in question."

In the instant proceeding the evidence unerringly points to the fact that plaintiffs sought recovery under the above theory and pursuant to the above principles. In the unusual circumstances at bar, the question whether the obligation was properly one which defendant "in equity and good conscience" should be required to pay, is reserved for later discussion.

■ Defendant's remaining assignments of error are predicated on his view of the evidence. First, he criticizes the express finding that the parties entered into the agreement hereinabove referred to "for the purpose of providing a residence for the defendants [*sic*] and their 4 children, and it was orally agreed that the defendant HERBERT L. ECKERT would make the payments to said Bank called for by said note evidencing said loan." According to defendant, no consideration was given by the trial court to his various conversations with Mr. Langford wherein the latter promised defendant that the Langord home would eventually belong to the Eckert family by will or otherwise. However, the trial court filed a memorandum of decision which stated, inter alia, that no evidence could be found of any agreement on the part of the Langfords to give or devise the property to defendant "although it may have been their intent to eventually devise the property to their daughter LYNN." Such memorandum also observed that this intention was expressed subsequent to the formation of the agreement and was no part thereof. Too, any such asserted agreement would have been invalid since it was not in writing (Civ. Code, § 1624, subd. 6.) "Agreements restricting the right to alienate real property or to make provision for any person by will are within the statute of frauds. [Citations.]" (*Estate of Baglione,* 65 Cal.2d 192, 197 [53 Cal.Rptr. 139, 417 P.2d 683].) Curiously enough, the bar of the above statute is pleaded as an affirmative defense in the answer to plaintiffs' amended complaint. True, it was observed in *Baglione* that there can be an estoppel to rely on the statute in the event of unconscionable injury or unjust enrichment "if the oral contract were not enforced" (p. 197), but here the court impliedly found there was no such oral contract. As the trial court stated in its memorandum, with reference to defendant's action in signing the note, "It is a gamble, but he gambled. The obligation is $24,000 against the possibility of receiving the residental property worth sixty or seventy thousand dollars. He lost on the gamble, but it doesn't relieve him of his obligation of paying the amount that was borrowed."

The point just discussed disposes of the asserted claim that the court should have implied an agreement to make a will. ■ By defendant's next assignment of error it is similarly argued that the court should have implied the reasonable stipulation that his divorce from Mrs. Eckert discharged him from further obligation under the note. Relied on are section 1655 (reasonable stipulations, when implied), section 1656 (necessary incidents implied) and the provisions of section 1438 of the Civil Code: "A condition

subsequent is one referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chôoses to avail himself of the condition." In *Lowe* v. *Copeland,* 125 Cal.App. 315 [13 P.2d 522], cited by defendant, the court declared that "the intent to create a condition subsequent must appear expressly or by clear implication [although] no precise words are necessary." (P. 321.) In the instant proceeding, it was for the trial court to determine whether the condition was clearly implied, there being no express reference thereto in the dealings between the parties. The court did not err in declining to imply the conditions and stipulations here asserted.

Again taking a partisan approach to the evidence, defendant next argues that the Langfords repudiated the agreement by refusing to reduce their promise (of testamentary disposition) to writing and by further statements to defendant that his payments on the note were nothing more than rent. The Langfords' testimony, wholly to the contrary, was presumably believed by the trial court; accordingly, the traditional rule on appeal involving conflicts in the evidence must govern. For the same reason, defendant's reliance on section 1440 of the Civil Code, relating to anticipatory breach, is misplaced; the trial court manifestly did not accord credence to defendant's testimony that his payments on the note were merely "rent" and that he should be excused from further performance, upon due notice to the other side, after he and his family had vacated the premises.

As his final contention, defendant argues that plaintiffs failed to show any damages occasioned by his alleged breach since they are not clearly ascertainable both in nature and origin (Civ. Code, §§ 3300, 3301). In advancing this claim, defendant points to the absence of any evidence as to the value of the real property in question at the time of trial—conceivably the improvements resulting from the transaction in suit could have increased the value of the property by as much as they cost—nor was there any showing that plaintiffs could not receive from a sale of their home an additional consideration equal to the cost of such improvements. The above argumer.*, while ingenious, is untenable. As shown earlier, plaintiffs' theory of recovery at bar was predicated on the principle that they were legally liable to the bank for the installment payments made and to be made. As stated in *Page* v. *Podol, supra,* 4 Cal.App.2d 229, 232: "No coercion by the commencement of legal proceedings was necessary. The existence of the liability was sufficient basis for Dr. Berry [plaintiff's testator] to make the payment and give him the right to recover from the defendant one-half the amount paid." In the present case the Langfords had to make the payments or suffer foreclosure proceedings. Accordingly, the value of the realty before or after improvements became of no legal consequence.

■ This brings us to the question, discussion of which was heretofore reserved, as to whether the instant obligation is one which "in equity and good conscience" defendant should be required to pay. Both the claim here prosecuted and the defense thereto are governed by equitable considerations, plaintiffs themselves citing *Philpott* v. *Superior Court*, 1 Cal.2d 512, 518-519 [36 P.2d 635, 95 A.L.R. 990]. Since equity does not do justice by piece-meal, there should be a complete disposition of the entire controversy by a court of equity when it has obtained jurisdiction. With a degree of under-standable bitterness defendant complains that he will now be required for more than 17 years to pay in monthly installments the balance due on the note although a considerable portion of the loan was used to improve the area of the residence used almost exclusively by plaintiffs; too, he and his family only used the improvements contracted for over a period of 30 or so months. At the very least, he argues, the court should have imposed a resulting trust so that in paying the loan he will have some commensurate interest in the property. This latter contention is made for the first time on appeal, although defendant unsuccessfully sought other affirmative relief (by way of counterclaim) against both plaintiffs—damages for the conversion to their own use of certain personal property, consisting of furniture and furnishings owned by him, after defendant left the premises.

To the above contentions plaintiffs reply that the trial court did its best to achieve equity by noting, in its memorandum opinion, that should defendant's wife or his children (if in her custody) ever reside in the Langford home, any payments made by defendant on the note might be taken into consideration by the appropriate department of the same court in determining alimony or child support payments; the judgment, however, is completely silent with respect to such contingencies.

■ While, as noted above, the present contention was not presented to the trial court for its determination, the rule seems to be that a court of equity should dispose of the entire controversy regardless of whether or not the relief administered has actually been requested. (18 Cal.Jur.2d Rev. Equity, § 13.) But there is this refinement of the rule: "Equity's responsibility to determine all actual controversies between the parties does not mean that it must adjudicate conjectural or premature matters which do not constitute actual and present controversies; nor does it mean that the court should attempt to resolve controversies in the absence of indispensable parties. [Citations.]" (*Platt* v. *Wells Fargo Bank,* 222 Cal.App.2d 658, 670 [35 Cal.Rptr. 377].) ■ If only because of the non-appearance in this proceeding of defendant's wife, an indispensable party to any determination

of the trust theory presently urged, we cannot say that the trial court erred in failing to find that the defendant was entitled to the offsets claimed.

The judgment is affirmed.

Wood, P. J., and Gustafson, J., concurred.