**Ben LINDSEY and Jerri Lindsey, husband and wife, Plaintiffs,**

**v.**

**CLOSSCO, a California limited partnership, Defendant.**

**No. CIV 84–2007 PHX EHC.**

United States District Court, D. Arizona, Phoenix Division.

July 30, 1986.

Michael J. LaVelle, Phoenix, Ariz., for plaintiffs.

Joseph E. Mais, Phoenix, Ariz., for defendant.

## MEMORANDUM OPINION AND ORDER

CARROLL, District Judge.

This action having been tried by the Court without a jury and being fully advised, the Court hereby makes the following findings of fact and conclusions of law. Rule 52, Fed.R.Civ.P.

### FINDINGS OF FACT

1. Plaintiff Ben Lindsey was head basketball coach at Grand Canyon College for seventeen (17) years. During this period Grand Canyon competed in the National Association of Intercollegiate Athletics (NAIA). As an NAIA member institution, Grand Canyon played its home basketball games in a small gymnasium with a seating capacity of approximately one thousand (1000). Despite two NAIA national championships during this period, Grand Canyon received limited exposure in the regional or national media. Grand Canyon had infrequent appearances on local cable television. Lindsey never received an offer of a shoe endorsement contract while at Grand Canyon.

2. The University of Arizona is a member of the National Collegiate Athletic Association (NCAA) and a participant in the Pacific Ten Conference. Since 1972 Arizona has played its home basketball games in an arena with a seating capacity of fourteen thousand (14,000). Arizona basketball games are broadcast regularly on local television and the program receives extensive coverage in the local and regional media. In addition, the Pacific Ten Conference markets a regional television contract which includes contests between the University of Arizona and its conference opponents.[1]

3. Defendant Clossco distributes athletic products manufactured by adidas in thirteen western states. Defendants' chief competitors in the athletic shoe market are Nike, Converse and Puma. As part of their advertising efforts, shoe manufacturers and their distributors regularly enter into contracts with professional athletes and coaches at prominent NCAA institutions.

Contracts with collegiate coaches provide, expressly or impliedly, that the coach will direct the university's team to wear the manufacturer/distributor's shoes in practices and games. The manufacturers/distributors thereby receive broad exposure of their products and the tacit endorsement of the universities, prominent college basketball teams and the NCAA.[2] Coaches view

---

1. Pacific Ten basketball receives extensive exposure in Los Angeles, California; San Francisco, California; Phoenix, Arizona; Tucson, Arizona; Corvallis, Oregon; Eugene, Oregon; Pullman, Washington; and Seattle, Washington.

2. Nothing in the Constitution of the National Collegiate Athletic Association prohibits a manufacturer/distributor of athletic equipment from donating equipment to an institution and publicizing the fact that the institution utilizes the equipment, so long as the names or pictures of the student-athletes are not directly involved in the publicity or promotion of the equipment. Constitution and Bylaws Case Book of the National Collegiate Athletic Association, Art. 3, Sec. 1 (1984). Unlike donations made directly to NCAA institutions, endorsement contracts entered into with collegiate coaches are directly contrary to the principle of institutional control

these shoe endorsement contracts as a method of supplementing the salaries they receive from the universities. Although these contracts virtually ensure that NCAA institutions shall utilize the manufacturers/distributors' shoes, the universities are not party to the contracts. These contracts routinely include a confidentiality clause, prohibiting disclosure of the terms of such agreements to other persons, necessarily including coaches, the institutions utilizing the shoes, and the NCAA. While the universities are not party to such contracts, representatives of the athletic departments of prominent NCAA institutions regularly exploit the existence of such contracts in negotiating with candidates for coaching positions. Thus some representatives of university athletic departments perceive a benefit to the universities from such agreements.

4. Plaintiff Ben Lindsey began negotiations to become Head Basketball Coach at the University of Arizona following the conclusion of the 1981–82 season. During those negotiations, Arizona Athletic Director David H. Strack represented that if Lindsey were to accept the position of head basketball coach, he could expect a shoe endorsement contract valued at twenty to thirty thousand dollars ($ 20,000–30,000) per year.

5. Lindsey was hired as head basketball coach in April, 1982. In May, 1982, Clossco representative Phil Vukicevich and Ben Lindsey entered into an oral agreement providing that Clossco pay Lindsey an annual "advisory and consulting" fee of thirty thousand dollars ($30,000) in return for Lindsey's commitment to have the University of Arizona basketball team wear adidas basketball shoes. This oral agreement did not include a provision respecting Clos-

sco's obligation in the event Lindsey should be terminated or resign for any reason.[3]

6. On May 26, 1982, Clossco president Bill Closs delivered a written agreement memorializing the parties' earlier oral agreement. This agreement referred to plaintiff Ben Lindsey as "Coach Lindsey" and "Ben Lindsey, Head Basketball Coach, University of Arizona." The material terms of this agreement provided:

Lindsey was to "have the University of Arizona basketball team exclusively in adidas brand basketball shoes." Further, Lindsey was to be available to Clossco/adidas for appearances such as clinics or special events, on behalf of adidas, on such dates as were mutually agreeable. Finally, Lindsey was to be available to adidas, at reasonable times, to advise and consult with adidas relative to the construction, design and playing features of adidas basketball shoes.

In return, Clossco was to pay Lindsey an annual fee of thirty thousand dollars ($ 30,000), provide Lindsey a clothing allowance of one thousand dollars ($ 1,000), provide two assistant coaches a clothing allowance of five hundred dollars ($ 500), provide forty (40) t-shirts for the team, and provide Lindsey one hundred-fifty (150) summer camp t-shirts.

The agreement also included the standard confidentiality clause contained in Clossco's shoe endorsement contracts:

The substance of this agreement shall not be divulged ... to any person except in the course of any legal proceedings to which any of the parties to this agreement is a party for the express purpose of securing compliance with this agreement.

7. Lindsey executed and delivered a revised agreement on June 4, 1982. This

and responsibility for the conduct of intercollegiate athletics. See *infra* note 5.

3. Clossco representative Phil Vukicevich testified that the company has included termination/resignation provisions in shoe endorsement contracts of professional athletes and some college coaches. While Clossco recognized that Lindsey was inheriting a weak team

and had little chance of success during the 1982–83 season, Clossco did not include a termination/resignation provision in any of the agreements it proposed, believing that this would provide a negative aspect to the agreement. This failure is not of legal consequence in view of the condition subsequent implied in the nature of the agreement. See *infra.*

agreement varied from the May 26, 1982 agreement in one material respect. Lindsey inserted a provision that Clossco provide seventy-five (75) pairs of basketball shoes for the basketball team. In this revised agreement, plaintiff referred to himself as "Coach Lindsey" and "Ben Lindsey, Head Basketball Coach, University of Arizona." Clossco never signed the June 4, 1982 revised agreement.

8. Following submission of the June 4, 1982 revised agreement, Lindsey asked that the "exclusive use" provision be deleted from the agreement. At that time, Lindsey expressed concern that the provision may be perceived to create a conflict of interest between his duties on behalf of Clossco/adidas and the University. Clossco acceded to Lindsey's request and agreed to delete the "exclusive use" provision.[4] The parties had a mutual understanding at this time, however, that under Lindsey's direction as head basketball coach, the University of Arizona basketball team would wear adidas basketball shoes, insofar as Lindsey could direct their use.

9. On July 6, 1982, Lindsey executed another contract This contract varied from the June 4, 1982 contract in three respects: the "exclusive use" provision which Lindsey found objectionable was deleted; the provision that Clossco provide seventy-five (75) pairs of basketball shoes for use by the University of Arizona basketball team was deleted; and Lindsey inserted a provision providing for the use of a Mercedes automobile at Clossco's expense. This agreement also referred to plaintiff Ben Lindsey as "Coach Lindsey" and "Ben Lindsey, Head Basketball Coach, University of Arizona." Clossco executed this agreement on July 19, 1982, after deleting the automobile provision. Clossco representative Phil Vukicevich sent Lindsey a letter on July 20, 1982, stating that he was attempting to get a "program" together which would provide Lindsey an automobile. Lindsey subsequently initialed the deletion of the automobile provision. Again, it was understood that Clossco would provide seventy-five (75) pairs of adidas basketball shoes for use by the University of Arizona basketball team each year and that Lindsey would direct his players to wear the shoes provided by Clossco.

10. Before the 1982–83 basketball season, Lindsey advised Arizona Athletic Director David H. Strack that he had entered into a shoe endorsement contract. The terms of the contract were not revealed to Strack or any other University officials.[5]

---

4. Lindsey testified that he was also concerned about his inability to guarantee that adidas basketball shoes would be worn by all team members.

5. The shoe endorsement agreement and the parties' failure to disclose the terms of the agreement to University officials are seemingly contrary to the principle of institutional control and responsibility for the conduct of intercollegiate athletics. The National Collegiate Athletic Association was established to uphold this principle. Constitution of the National Collegiate Athletic Association, Art. 2, Sec. 1(b), Art. 3, Sec. 2 (1984). This principle prohibits outside groups, such as athletic products manufacturers/distributors, from regularly supplementing coaches' salaries or compensating coaches for additional work performed without the approval of the board in control of intercollegiate athletics at the employer institutions.

The principles of institutional control and responsibility prohibit an outside source from paying or regularly supplementing such an individual's annual salary. This includes the donation of cash from outside sources to the institution earmarked for the staff member's salary or supplemental income. It would be permissible for an outside source to donate funds to the institution to be used as determined by the institution; and it would be permissible for the institution to determine, at its sole discretion, that the funds should be used to pay or supplement a staff member's salary. It would also be permissible for a staff member to earn income over and above the institutional salary by performing services for outside groups, provided that the compensation is for additional work actually performed and at a rate commensurate with the going rate in that locality for services of like character; further, provided such outside work is in conformity with institutional policy and with the approval of the institution. In any case, the institution shall remain in control of determining who is to be its employee and the amount of salary the employee is to receive.

Constitution and Bylaws Case Book of the National Collegiate Athletic Association, Art. 3, Sec. 2 (1984). Because of the resolution of this case, see *infra*, the Court need not apply the

11. Throughout the 1982–83 basketball season, University of Arizona basketball players, with few exceptions, wore adidas basketball shoes. Don Crenshaw, a Clossco promotion representative, monitored Lindsey's compliance with the shoe endorsement agreement. At various times throughout the season he contacted Lindsey and discussed Lindsey's obligation to encourage and direct use of adidas shoes by all his players. Lindsey recognized this obligation and cooperated throughout the season. Clossco/adidas never requested that Lindsey make any appearances or consult with them relative to adidas basketball shoes.

12. In January, 1983 defendant Clossco paid plaintiff Lindsey a five thousand dollar ($ 5,000) advance on the second contract year.

13. The University of Arizona terminated plaintiff Ben Lindsey from the position of head basketball coach in March, 1983. Thereafter Lindsey made a demand for further payment under the agreement. That demand was denied by defendant Clossco.

## CONCLUSIONS OF LAW

1. The June 4, 1982 and July 19, 1982 agreements, by their terms, are governed by California law. Restatement of Law (Second) Conflict of Laws, Section 187 (1969). The oral agreement reached following delivery of the June 4, 1982 written agreement to defendant is also governed by California law. Restatement of Law (Second) Conflict of Laws, Section 188 (1969). This Court must follow the conflict of laws rule of the State of Arizona, as the state in which this Court is located. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020 (1949). The Arizona Supreme Court has frequently stated that in the absence of a controlling statute or decision, the Restatement of Law will be followed, and this rule applies in the area of conflict of laws. *Taylor v. Security National Bank*, 20 Ariz.App. 504, 507, 514 P.2d 257, 260 (1973) (citing *Smith v. Normart*, 51 Ariz. 134, 75 P.2d 38 (1938)).

2. Each of the agreements reached by the parties is governed by the Statute of Frauds, as each agreement was to be performed over three basketball seasons. An agreement that by its terms is not to be performed within a year from the making thereof is invalid unless it is in writing and subscribed to by the party to be charged or his agents. Cal.Civ.Code, Section 1624 (1985).

3. The June 4, 1982 agreement was enforceable against plaintiff Ben Lindsey, though Clossco never signed the agreement. A contract within the Statute of Frauds, subscribed to by the party to be charged or his agent, is enforceable, though not signed by the other party to the contract. *Wood Building Corp. v. Griffitts*, 164 Cal.App.2d 559, 564, 330 P.2d 847, 852 (1958); *Cowan v. Tremble*, 111 Cal. App. 458, 296 P. 91, 93 (1931).

4. Following execution and delivery of the June 4, 1982 agreement by plaintiff Ben Lindsey, the parties orally rescinded that agreement. Recission of the June 4, 1982 agreement was contemporaneous with and conditioned on the entering into of an oral agreement requiring plaintiff to "encourage" members of the University of Arizona basketball team to wear adidas basketball shoes provided by Clossco. A written contract may be rescinded by an oral agreement. Cal.Civ.Code, Section 1698(d). Parol evidence is admissible to show substitution of a new agreement, notwithstanding that the original contract was in writing. *Gottlieb v. Tait's, Inc.*, 97 Cal.App. 235, 275 P. 446 (1929); *Pearsall v. Henry*, 153 Cal. 314, 95 P. 159 (1908).

5. The July 19, 1982 written agreement does not supersede the oral agreement reached following delivery of the June 4, 1982 contract to Clossco. The parties did not intend that the July 19, 1982 written agreement would serve as the exclusive embodiment of their agreement. Phil Vukicevich's letter of July 20, 1982 indicates that as of that date the parties were still negotiating a "program" which would pro-

principle *ex dolo malo non oritur actio* in deny-

ing plaintiff relief.

vide Lindsey use of an automobile at Clossco's expense. The rule that an agreement in writing supersedes all prior or contemporaneous oral negotiations or stipulations concerning its matter is limited to those cases where the parties intended the writing to be complete unto itself. *Salyer Grain & Milling Co. v. Henson,* 13 Cal. App.3d 493, 496, 91 Cal.Rptr. 847, 850 (1970).

Further, the July 19, 1982 written agreement was silent with respect to Lindsey's obligation to direct the University of Arizona basketball team to use adidas basketball shoes and Clossco's obligation to provide the shoes. A subsequent written agreement does not supersede a collateral agreement upon which the instrument is silent, and which does not purport to affect the terms of the instrument. *Quality Building & Securities Co. v. Bledsoe,* 125 Cal. App. 493, 496, 14 P.2d 128, 131 (1932).

6. Ben Lindsey's termination as head basketball coach at the University of Arizona operated as a condition subsequent, extinguishing Clossco's obligation to perform. "A condition subsequent is one referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chooses to avail himself of the condition." Cal.Civ. Code, Section 1438 (1972). While the intent to create a condition subsequent must appear expressly or by clear implication, no precise words are necessary. *Langford v. Eckert,* 9 Cal.App.3d 439, 446, 88 Cal.Rptr. 429, 432 (1970); *Lowe v. Copeland,* 125 Cal.App. 315, 321, 13 P.2d 522, 525 (1932). It is clear from the nature of the agreement that it was entered into subject to the implied condition subsequent that it should be binding only if Lindsey remained head basketball coach at the University of Arizona. The services to be performed under the agreement, i.e., "encouraging" or promoting by his best efforts the use of adidas basketball shoes by the University of Arizona basketball team, were of such character that they could be performed effectively only if Lindsey retained the position of head basketball coach at the University. This is particularly clear in view of the fact that Lindsey's successor, Lute Olson, entered into a shoe endorsement contract with Nike, one of adidas' competitors.[6]

In the event any of the findings of fact or conclusions of law should more appropriately be considered as the other, they shall be so considered.

### ORDER

IT IS ORDERED that Judgment shall be entered in favor of defendant Clossco and that plaintiffs take nothing.

IT IS FURTHER ORDERED that defendant shall submit an Application For Attorney's Fees within ten (10) days of this Order.

---

**6.** Testimony of Phil Vukicevich.