[Civ. No. 67623. Second Dist., Div. Four. Dec. 19, 1984.]

In re the Marriage of BETH and ROY E. STEPHENSON.
BETH STEPHENSON, Appellant, v.
ROY E. STEPHENSON, Appellant;
RONALD STEPHENSON, Appellant;
PAMELA STEPHENSON et al., Respondents.

**COUNSEL**

Richard B. Newton for Appellant Wife.

Jaffe & Clemens, Daniel J. Jaffe and Honey Kessler Amado for Appellant Husband.

M. S. Rose for Appellant Ronald Stephenson and for Respondents.

**OPINION**

**McCLOSKY, J.**—Petitioner below Beth Stephenson (Beth) appeals and respondent Roy Stephenson (Roy) and claimant Ronald Stephenson (Ron) cross-appeal from the further judgment of dissolution of marriage.

Roy and Beth were married on August 23, 1948. On April 27, 1979, they separated.[1] Thereafter, Beth filed a petition for the dissolution of their marriage and also filed complaints to quiet title to community property in name of joined parties.

Through these complaints Beth claimed the community had an interest in properties which Roy had purported to transfer to the named claimants.[2]

---

[1]For purposes of the division of the community property, the parties stipulated that Roy and Beth separated on April 30, 1979.

[2]The named claimants are Ronald and Pamela Stephenson, Richard and Janet Brunson, Lori Stephenson and Cathy Sonnenberg.

Those claimants were the couple's children and the children's spouses. All claimants filed answers.

The trial court initially rendered an interlocutory judgment of dissolution and a final judgment of dissolution of marriage each of which provided that "[t]he sole issue determined by this Judgment is dissolution of the marriage. The Court reserves jurisdiction to determine all issues except the dissolution of marriage issue." (See *In re Marriage of Lusk* (1978) 86 Cal.App.3d 228, 234-235 [150 Cal.Rptr. 63].)

Acting pursuant to a stipulation of the parties, the trial court appointed Judge Parks Stillwell, retired, to act as referee over the remaining issues of the petition for dissolution. (Code Civ. Proc., § 638.) After hearing, the referee issued his findings of facts and conclusions of law which findings the trial court adopted in rendering its "Further Judgment Upon Reserved Issues After Judgment of Dissolution of Marriage Following Findings of Facts and Conclusions of Law of Referee." From this judgment Beth appeals and Roy and Ron each cross-appeal.

### BETH'S APPEAL

### CONTENTIONS

Beth raises the following contentions:[3]

1. "The uncontroverted facts disclose an absence of donative intent to make a gift accompanied by irrevocable divesture of control.

2. "The absence of written consent by appellant entitled her to set aside the 'gifts' to respondent-claimants.

3. "Funds in the two (2) First Federal accounts awarded to respondent-claimants are not traceable to the custodial accounts.

4. "The sum of $123,830.62 was erroneously awarded to claimants.

5. "The award to respondent-claimant Cathy Sonnenberg is inconsistent with the record.

6. "Equalizing distribution of UGMA funds was erroneous."

---

[3]Claimant Cathy Sonnenberg has not responded to this appeal.

## I

Beth first contends that "the uncontroverted facts disclose an absence of donative intent to make a gift accompanied by irrevocable divesture of control."

In the period commencing on April 5, 1967, and ending on December 9, 1979, Beth and Roy opened up 16 "custodial savings accounts" on behalf of their then minor children.[4]

The referee found that these accounts "were opened for the children of Petitioner [Beth] and Respondent [Roy] under the California Uniform Gift[s] to Minors Act (UGMA), utilizing, in each instance, community funds. . . . [Beth] was aware of, consented to, and to the extent indicated, participated in the opening of said accounts." Those findings traced funds withdrawn from the custodial accounts to the purchases of stock in the "Mountain Mushroom Company," to loans to Janet, to loans to relatives of petitioner and to certificates of deposit. The referee also found that "it was the intent of [Beth and Roy] when opening the UGMA accounts, to benefit each of their four (4) children equally."

Based upon these findings, the trial court in its further judgment provided that the above gifts "conveyed to [the claimants] indefeasibly vested legal title" to that community property in equal shares.

Because the trial court's award to the claimants is premised upon the character of the original custodial savings account, the validity of the award depends upon whether those accounts created indefeasibly vested title in the claimants.

■ The California version of the Uniform Gifts to Minors Act (UGMA) is embodied in Civil Code section 1154 et seq.[5] The purpose of this act is to provide a simple, inexpensive and nonexclusive method for making gifts to minors. (See 3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 97, p. 1694; § 1163, subd. (b).)

Section 1156, subdivision (a)(3), provides in pertinent part: "An adult person may, during his lifetime, make a gift of . . . money, . . . to a person who is a minor on the date of the gift: [¶] . . . by paying or delivering it

---

[4]Roy opened up eight accounts on behalf of Lori, three on behalf of Cathy, two on behalf of Ron, and one on behalf of Janet. Beth opened up one account on behalf of Janet and one on behalf of Ron.

[5]Unless otherwise specified all further statutory references will be to the Civil Code.

to a broker or a financial institution, for credit to an account in the name of the donor, . . . followed, in substance, by the words: 'as custodian for ___ (Name of minor) under the California Uniform Gifts to Minors Act.' "

Section 1157, subdivision (a) provides: "A gift made in a manner prescribed in this article is irrevocable and conveys to the minor indefeasibly vested legal title to the custodial property given, but no guardian of the minor has any right, power, duty or authority with respect to the custodial property except as provided in this article."

Beth first urges that several of the subject custodial accounts do not comport with the requirements for opening up a UGMA account.

■ Three of the accounts were not originally designated under the UGMA.[6] Those three accounts all essentially provided "Roy E. Stephenson custodian for: Lori Stephenson." Those accounts were later designated as "Roy E. Stephenson as custodian for Lori Stephenson, under California Uniform Gifts to Minors account [*sic*]." This comports with the requirements for creating a UGMA account and we therefore reject Beth Stephenson's assertion to the contrary.

Beth next urges that the accounts which are designated under the UGMA could not validly divest her of her community property interest because: (1) the controlling factor in opening them up was to obtain advantageous tax treatment, (2) the evidence demonstrates a lack of donative intent and (3) the uncontested findings of the referee establish that Roy never relinquished control of the funds placed in the accounts.

■ The two basic elements of a gift made by a means other than the UGMA are (1) the intention of the donor to make a voluntary transfer to the donee, and (2) a delivery, actual or constructive, by the donor to the donee or to someone on his behalf. (*Berl* v. *Rosenberg* (1959) 169 Cal.App.2d 125, 130 [336 P.2d 975].) The UGMA eliminated the requirement of a transfer. (§ 1156, subd. (c).) The donor must still, however, have a donative intent.

In *Gordon* v. *Gordon* (1979) 70 App.Div.2d 86 [419 N.Y.S.2d 684], affd. 52 N.Y.2d 773 [436 N.Y.S.2d 621, 417 N.E.2d 1009], the court determined that the opening of a bank account pursuant to the UGMA was prima facie evidence of the donor's donative intent, which evidence could be rebutted by extrinsic evidence. The court further determined that the provision

---

[6]A fourth contains the designation "Roy Stephenson as trustee for Cathy L. Stephenson UGMA." We conclude that this constitutes substantial compliance with the UGMA.

in the act which states that "a gift made in the manner so prescribed is 'irrevocable and conveys to the minor indefeasibly vested legal title to' the property" (see § 1157, subd. (a)), presupposes that there was a gift in the first instance.

Following similar reasoning, the court in *In re Marriage of Jacobs* (1982) 128 Cal.App.3d 273 [180 Cal.Rptr. 234], upheld the trial court's factual determination that the husband lacked donative intent in purportedly setting up UGMA accounts for the couple's children. The evidence upon which the court based its determination was that the husband had placed the money into the accounts to avoid adverse tax consequences and that the parties treated the money in the account as their own.

■ Beth too urges that the evidence in the case at bench proves that Roy had no donative intent, referring to evidence that Roy opened up the subject accounts to avoid adverse tax consequences and that Roy treated the funds in the accounts as his own prior to the dissolution proceedings. " '[I]ntent' and 'purpose' [, however,] are ordinarily questions of fact to be determined by the trial court." (*Platt* v. *Wells Fargo Bank* (1963) 222 Cal.App.2d 658, 664 [35 Cal.Rptr. 377].)

While in *Jacobs* similar evidence was held sufficient to affirm the trial court's factual determination that there was an absence of donative intent, it did not establish as a matter of law that no such intent existed. We adopt the reasoning of the *Gordon* court that the opening up of a bank account pursuant to the UGMA is prima facie evidence of donative intent. Accordingly, that evidence is sufficient to support the trial court's factual determination.

Beth next urges that "the findings of the trial court render erroneous its conclusions and order that the transfers were gifts."

■ "Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error." (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 344, p. 3145.)

■ Beth focuses on the finding of the referee that "[u]ntil the separation of Petitioner and Respondent, all dividends from the Castle & Cooke, Inc. stock as well as the principal of and interest from all of the UGMA accounts, were spent, lent, and reinvested by Petitioner and Respondent. The share certificates, passbooks evidencing the accounts in savings institutions, and the promissory notes were, at all times, until separation, in the custody of Respondent."

Beth urges that this finding is irreconcilably inconsistent with the trial court's conclusion that Beth and Roy made an irrevocable gift of the subject property to the claimants.

Generally, a donor's retention of control over the property purported to be given is strong evidence that no gift was intended by him. (See *Blonde v. Estate of Jenkins* (1955) 131 Cal.App.2d 682, 685-686 [281 P.2d 14].) Under the UGMA, however, this retention of control is not afforded such great weight. Section 1156, subdivision (c) in pertinent part provides: "A donor who makes a gift to a minor in a manner prescribed in subdivision (a) shall promptly do all things within his power to put the subject of the gift in the possession and control of the custodian, but . . . the donor's failure to comply with this subdivision, [does not affect] the consummation of the gift."

Accordingly, the retention of control over the subject property by Roy and Beth, alluded to in the foregoing finding, did not prevent the consummation of the gift. That finding was not inconsistent with the trial court's conclusion that a gift had been made.

## II

Beth next contends that "the absence of written consent by appellant entitled her to set aside the 'gifts' to Respondent-Claimants." The referee found, and Roy does not dispute, that community property funds were utilized in opening the 16 savings accounts.

■ Since 1978, section 5125, subdivision (b) has provided: "A spouse may not make a gift of community personal property, or dispose of community personal property without a valuable consideration, without the written consent of the other spouse."[7]

A gift made by one spouse in violation of this section is voidable by the other spouse in its entirety during the donor spouse's lifetime if the community has not yet been dissolved but if action is taken after the donor spouse's death or after the community has been dissolved, it is voidable only to the extent of one-half. (*Bank of California v. Connolly* (1973) 36

---

[7]From 1975-1978, section 5125, subdivision (b) provided that "[a] spouse may not make a gift of community personal property, or dispose of community personal property without a valuable consideration . . . ." (Stats. 1974, ch. 1206, p. 2609.) From 1891-1975 this subdivision was substantially the same as it exists today. (See Note, *Domestic Relations; modification of spousal support and gifts of community property* (1978) 9 Pacific L.J. 497.)

Both parties' discussion of this contention is premised upon the application of the current version of this subdivision. Accordingly, we, too, proceed on that basis.

Cal.App.3d 350, 377 [111 Cal.Rptr. 468]; *Harris* v. *Harris* (1962) 57 Cal.2d 367, 369 [19 Cal.Rptr. 793, 369 P.2d 481].)

We deal first with those UGMA accounts opened by Roy. The record is devoid of evidence that Beth gave her written consent to the opening of those accounts with community property funds.

The referee concluded, however, that Beth "will not now be heard to allege that the UGMA Accounts were opened without her written consent and said gifts, made with the consent and approval of both Petitioner and Respondent, are irrevocable and, when made, conveyed to the minor children indefeasibly vested legal title."

In urging the correctness of this conclusion, Roy relies on the provisions of section 1157, subdivision (b) which states that a gift made pursuant to the UGMA is "irrevocable and conveys to the minor indefeasibly vested legal title to the custodial property . . . ." We conclude that this subdivision does not preclude a spouse from voiding a gift of community property that is otherwise voidable. (See *In re Marriage of Hopkins* (1977) 74 Cal.App.3d 591, 602, fn. 7 [141 Cal.Rptr. 597]; cf. *Estate of Bray* (1964) 230 Cal.App.2d 136 [40 Cal.Rptr. 750].)

In *Bray,* the husband purchased savings bonds with community funds without the knowledge or consent of his wife. He registered those bonds jointly in the names of himself and his son. Husband subsequently died and the son contended that pursuant to statutory and case authority he was entitled to full ownership of the bonds, regardless of the community property laws. The court rejected this contention, concluding that this would result in an impermissible conversion of the wife's assets. Accordingly, the court held that the purchase of the savings bonds by husband could not defeat the community property interest of the wife.

We, too, conclude that one spouse cannot defeat the interest of the other spouse in the community property by unilaterally purporting to make a gift of it pursuant to the UGMA. Consequently, absent written consent, written ratification,[8] waiver or estoppel, the nondonor spouse is not precluded from voiding the gift.

The referee apparently concluded that Beth is estopped or has waived her right to void the subject gifts. "Questions of waiver and estoppel

---

[8]Ratification is equivalent to consent made after the gift. (1 Markey, Cal. Family Law: Practice and Procedure (1984) Community Property, § 5.52 [4][d], p. 5-79; see *Spreckels* v. *Spreckels* (1916) 172 Cal. 775 [158 P. 537].)

involve issues of fact for the trial court." (*Los Angeles Fire & Police Protective League* v. *City of Los Angeles* (1972) 23 Cal.App.3d 67, 75 [99 Cal.Rptr. 908].) ■ "Estoppel applies to prevent a person from asserting a right where his conduct or silence makes it unconscionable for him to assert it." (*In re Marriage of Recknor* (1982) 138 Cal.App.3d 539, 546 [187 Cal.Rptr. 887, 34 A.L.R.4th 805].) Either unjust enrichment or a change in position may be the basis of an unconscionable injury which will estop a person from asserting the requirement of a writing. (*Mintz* v. *Rowitz* (1970) 13 Cal.App.3d 216, 224-225 [91 Cal.Rptr. 435].)

■ "Waiver requires a voluntary act, knowingly done, with sufficient awareness of the relevant circumstances and likely consequences. [Citation.] There must be actual or constructive knowledge of the existence of the right to which the person is entitled. [Citation.] The burden is on the party claiming a waiver to prove it by evidence that does not leave the matter doubtful or uncertain and the burden must be satisfied by clear and convincing evidence that does not leave the matter to speculation. [Citation.] This rule particularly applies to cases involving a right favored in law such as . . . the right to retain lawful property entitlement . . . ." (*In re Marriage of Moore* (1980) 113 Cal.App.3d 22, 27 [169 Cal.Rptr. 619].)

■ In support of the trial court's conclusion, claimants refer to evidence demonstrating that Beth had knowledge and participated in the couple's program of opening up savings accounts for their children pursuant to the UGMA.

This evidence is insufficient to support a finding of either estoppel or waiver. With regard to estoppel, the record contains neither evidence that the claimant children changed their position in a manner that will cause them to suffer an unconscionable injury should Beth void the gifts, nor evidence that Beth will be unjustly enriched in such an event. Accordingly, there is insufficient evidence to support a finding that Beth is estopped to void the subject gifts.

With regard to waiver, the evidence to which Roy refers is insufficient to demonstrate that Beth knowingly and voluntarily waived her property interest in the UGMA accounts set up by Roy or that she knowingly and voluntarily waived her right to veto such transactions by withholding her written consent.

The cases to which claimants refer in support of their assertion are distinguishable. Those cases involve situations in which a wife's participation or acquiescence in the disposition of community property to third parties induced those parties to deal with the property as if she had consented to

that disposition, to the detriment of the third parties. (See *MacKay* v. *Darusmont* (1941) 46 Cal.App.2d 21, 26 [115 P.2d 221]; *Bush* v. *Rogers* (1941) 42 Cal.App.2d 477, 479-480 [109 Cal.Rptr. 379].) The record contains no such evidence of detrimental reliance in this case.

The amendments to section 5125, subdivision (b) clearly demonstrate the Legislature's desire to strictly regulate one spouse's ability to give away community property. This is evidenced by the 1975-1978 version of that subdivision under which a spouse was precluded from making any gift of community personal property. The reenactment of the provision allowing for gifts of community personal property with the *written* consent of the other spouse in 1978 must be interpreted to require something more than the tacit approval of the gift by the nondonor spouse. A different interpretation would entirely vitiate the writing requirement. We decline to engage in such "doctrinal machinations." (See Bruch, *Management Powers and Duties Under California's Community Property Law: Recommendations For Reform* (1982) 34 Hastings L.J. 227, 239-240.) While the application of this rule may be harsh in the case at bench, any change in this scheme is for the Legislature and not this court to make.

Claimants next urge that section 5125, subdivision (b) is not applicable because the tax benefits Beth received from the UGMA accounts constituted adequate consideration and therefore were not "gifts" within the meaning of that subdivision. We disagree. If Beth received tax benefits from the UGMA accounts it was because of their status as "gifts." Claimants cannot successfully urge that benefits received by a donor as a result of making gifts destroys their status as a gift.

We, therefore, conclude that Beth was entitled to void the purported gifts made by Roy.

With respect to the UGMA accounts opened by Beth, we reach a different result. Beth is precluded from voiding any of the transfers of the subject property to the extent they are traceable to those accounts. (See *Dahne* v. *Dahne* (1920) 49 Cal.App. 501, 506 [193 P. 785].)

### III

Beth contends that the "funds in the two (2) First Federal accounts awarded to Respondent-Claimants are not traceable to the custodial accounts."

The trial court found that "funds to buy the certificates of deposit which are now First Federal Savings of Santa Monica account Nos. 9-154766-1 in

the approximate amount of $100,000 and 0-116573-7 in the approximate amount of $100,000 came from nine (9) of the UGMA accounts."

We need not, and do not, decide whether there is sufficient evidence to trace these funds to the UGMA accounts. Accepting claimants' tracing as correct, none of these funds are traced to the UGMA accounts opened by Beth.

Accordingly, for the reasons explained above, Beth was entitled to void those transfers due to Roy's failure to obtain her written consent. We, therefore, conclude the trial court erred in awarding these amounts to claimants.

## IV

Beth next contends that "the sum of $123,830.62 was erroneously awarded to claimants." In October 1976, Ron and Pamela Stephenson purchased a home and lot located at 3587 Ocean View in Mar Vista, California. Thereafter, they split the lot and had Stephenson and Sons, Inc. construct a house on the newly created vacant lot which had an address of 3591 Ocean View.

On January 3, 1979, Ron sold the newly constructed house for a net return of $223,830.62. The following day he paid Stephenson and Sons Corporation $100,000 as payment for its construction work.

On January 6, 1973, Ron wrote a check to Roy for $123,830.62, the remaining amount received from the sale of the house. Roy put $100,000 of this into a certificate of deposit in both his and Ron's name. Thereafter Roy and Ron removed Roy's name leaving only Ron's. Roy put the remaining $23,830.62 into a separate certificate of deposit. The evidence adduced at trial was that Roy subsequently remitted to Ron a large portion of the $23,830.62.

The referee found that "[t]he net proceeds of the sale by Claimants, Ronald and Pamela Stephenson, of the house at 3591 Ocean View as evidenced by a check written to Respondent in the sum of $123,830.00 . . . is the property of Ronald and Pamela Stephenson. The community has no interest in any portion of said sum. The community is indebted to Ronald and Pamela Stephenson in the sum of $3,751.00 by reason thereof. The community has no interest in any of the savings or checking accounts standing in the name of Ronald and Pamela Stephenson."

Beth urges that the construction and sale of the subject property was done pursuant to a joint venture between Ron and the Stephenson and Sons Cor-

porations and therefore the proceeds of that sale belonged to the joint venture and not solely to Ron.

The trial court's determination of the nature of the transaction was based upon its resolution of conflicting inferences from the evidence. Therefore, its conclusion will be upheld as long as the record on appeal contains substantial evidence to support it. (*Milligan* v. *Hearing Aid Dispensers Examining Com.* (1983) 142 Cal.App.3d 1002, 1005 [191 Cal.Rptr. 490].) This standard of review applies even accepting as true Beth's assertion that because the subject funds were acquired in Roy's name during marriage, they are presumptively community property. (*In re Marriage of Knickerbocker* (1974) 43 Cal.App.3d 1039, 1042 [118 Cal.Rptr. 232].)

The record contains evidence that Ron transferred the first $100,000 to Roy pursuant to their agreement that Roy was to contribute an additional $100,000 which would then be jointly invested. Thereafter, when Roy failed to contribute his $100,000, his name was removed from the certificate of deposit, leaving Ron as the sole owner. The record contains additional evidence that the remaining $23,830.62 which Ron transferred to Roy was a loan. This evidence is sufficient to uphold the trial court's factual determination that those funds belonged to Ron.

## V

Beth next contends that "the award to Respondent-Claimant Cathy Sonnenberg is inconsistent with the record."

In her "Answer to Complaint to Quiet Title" claimant Cathy Sonnenberg admitted that she had no interest in the property at issue. The trial court, therefore, erred when it adopted the referee's finding that she had an interest in the subject property. (49 Cal.Jur.3d, Pleading, §§ 203-204 (1979) pp. 640-641.)[9]

## VI

Beth next contends that the "equalizing distribution of the UGMA funds was erroneous."

The referee's conclusion, which the trial court adopted, awarded the funds traceable to the UGMA accounts to the children in equal shares. Pursuant

---

[9]The referee summarily disregarded Cathy's answer due to his apparent belief that she did not knowingly file it. In so acting he erred, as there was no evidence that that pleading either was a sham or was irrelevant. (See former Code Civ. Proc., § 453, now Code Civ. Proc., § 436; Stats. 1982, ch. 704, § 3, p. 2857.)

to section 1156, subdivision (b), a gift made under the UGMA "may be made to only one minor." Accordingly, to the extent any of the subject property is traceable to the accounts opened by Beth, it should only be awarded to the named donee of the account to which it is traced.

### RON'S CROSS-APPEAL

### CONTENTIONS

Ron raises the following contentions on appeal:

1. "A fully written, signed, employment agreement concerning Ron Stephenson was offered and proved to and received and accepted by the court.

2. "Ron Stephenson is entitled to 50% of all profits from Stephenson & Sons, Inc. and Stephenson & Sons Enterprises, Inc., whether distributed as salary, bonus, or carried as retained earnings in the corporations.

3. "Ron Stephenson is entitled to unpaid salaries and undistributed profits of Stephenson & Sons, Inc. and Stephenson & Sons Enterprises, Inc., and for his interest in accumulated assets of the corporations since September 1, 1977."

### FACTS

In 1977, following the formation of Stephenson and Sons, Inc. (hereafter Inc.) and Stephenson and Sons Enterprises, Inc. (hereafter Ent.), Roy decided to bring his son Ron into his business.[10] Inc. was primarily concerned with the framing and construction business while Ent. was involved in land acquisition and management. Roy and his financial advisor, Fred Stephenson, discussed various methods of having Ron participate in 50 percent of the profits of both corporations. They decided against having Ron buy into the business because that would require that he be guaranteed a large enough salary to be able to afford the payments. Consequently, Roy instructed Fred to draft the subject employment agreement.

Upon Roy's receipt of a rough draft of that agreement, he discussed its terms with Beth, Ron and Ron's wife. In its final form, that agreement in pertinent part provided: "Ron Stephenson be employed by Stephenson & Sons, Inc. and Stephenson & Sons Enterprises, Inc. and spend all of his working time with these two corporations. [¶] Ron Stephenson will receive

---

[10]These entities were formed following the dissolution of Stephenson and Benz, Inc. and Stephenson and Benz Enterprise, Inc.

50% of all profits from Stephenson & Sons, Inc. and Stephenson & Sons Enterprises, Inc. whether distributed as salary, bonus, or carried as retained earnings in the corporation. [¶] But in no event would he receive less than $30,000 of income per year."

The referee found: "That certain Agreement entered into between Respondent and Claimant, Ronald Stephenson, dated September 7, 1977 .... is a contract of employment and is valid. Said Agreement does not convey to Claimant, Ronald Stephenson, any interest in the assets of Stephenson & Sons, Inc. or Stephenson & Sons Enterprises, Inc. The word 'profits' as used in said Agreement does not include income from any passive investments or holdings of the foregoing corporations or of the parties, namely, rents, interest or payment on promissory notes."

The judgment rendered by the trial court provided that Ron had no interest in or to any of the assets of Stephenson & Sons, Inc. or Stephenson & Sons Enterprises, Inc. as of the date hereof.

## Discussion

### I

Ron first contends "a fully written, signed, employment agreement concerning Ron Stephenson was offered and proved to and received and accepted by the court."

Ron does not discuss why this contention is pertinent to his cross-appeal and Beth does not contest the validity of the subject agreement. We, therefore, need not, and do not, discuss this contention.

### II

Ron contends that he "is entitled to 50% of all profits from Stephenson & Sons, Inc. and Stephenson & Sons Enterprises, Inc. whether distributed as salary, bonus, or carried as retained earnings in the corporations."

He urges that the trial court erred by receiving extrinsic evidence of the intentions of the parties to interpret the use of the word "profits" in the employment agreement. The record does not contain any objections by Ron to the introduction of evidence relevant to the intentions of the parties in entering into the employment agreement. Ron may, therefore, be held to have waived this contention. We nevertheless reject it on its merits.

The intended meaning of "profits" as a measure of compensation is dependent on the particular context in which it is used. (See *Nelson* v.

*Abraham* (1947) 29 Cal.2d 745, 752-754 [177 P.2d 931]; *Axell* v. *Axell* (1952) 114 Cal.App.2d 248, 253 [250 P.2d 182]; 29 Cal.Jur.3d, Employer and Employee, § 35 (1976) pp. 514-515.) Consequently, extrinsic evidence is appropriate to determine the intentions of the parties in using profits as a measure of compensation.

## III

 Ron next contends that he "is entitled to unpaid salaries and undistributed profits of Stephenson & Sons, Inc. and Stephenson & Sons Enterprises, Inc. and for his interest in accumulated assets of the corporations since September 1, 1977." He urges that he is entitled to unpaid salaries or profits for the fiscal years 1978-1979 from Inc. and Ent. and his proportionate share of the assets of the business acquired after the effective date of the agreement. This later category consists of one half of the value of the tools and equipment of the businesses; one half of the businesses' interest in the Malaga Cove real property and one-half of the intangible value of the business.

This contention attacks two aspects of the referee's finding. The first is that portion of the finding providing that the agreement did not convey any interest in the assets of the corporations. The uncontroverted testimony and the language of the employment agreement was that the agreement entitled Ron to interest in the profits or earnings of the corporations but that it entitled him to no interest in the corporations.

"The term 'profits' as used in an agreement by which profits are included as a basis for compensation should be construed in accordance with the language of the contract and the surrounding conditions and circumstances, and generally means that which remains of the gross receipts of the business after all legitimate expenses and business losses have been deducted." (56 C.J.S. (1948) Master and Servant, § 112, p. 548; see also *Martin* v. *Davis Constructors, Inc.* (Tex.Civ.App. 1977) 552 S.W.2d 873, 878; *Boradori* v. *Peterson* (1927) 86 Cal.App. 753, 759-760 [261 P. 520].)

Ron directs us to no evidence in the record, and we have found none, indicating that the parties intended that he acquire an interest in the assets of the corporation other than the right to receive 50 percent of the profits. Absent such evidence, we construe "profits" in accord with its general meaning and conclude that Ron's right to share in the profits of the corporations is restricted to what remains of the gross receipts of the business after all legitimate expenses and business losses have been deducted. We, therefore, affirm this aspect of the referee's finding and the resulting conclusion by the trial court.

■ We next review that portion of the finding which provided that "profits" as used in the agreement does not include any income from the passive investments of the corporations. There is no dispute that Ent. was the corporation that dealt with the passive investment. The employment agreement provided that Ron was to receive 50 percent of all profits from both Inc. and Ent. Beth urges, that contrary to the clear language of this agreement, Ron was to receive only a share of the profits from Inc. and not Ent. In support of this assertion, Beth relies on *Sweeney* v. *Earle C. Anthony, Inc.* (1954) 128 Cal.App.2d 232 [275 P.2d 56].

In *Sweeney,* one division of defendant company operated radio and television stations. Plaintiff was employed as a sales manager under a contract which provided that his income was to be calculated in part upon the net profits of the radio division. During the contract period, defendant company sold a radio station thereby generating capital gains. Defendant company refused to include these gains in calculating plaintiff's income and consequently plaintiff sued.

The *Sweeney* court determined that "net profits" as used in the contract was fairly susceptible to one of two meanings and therefore extrinsic evidence was admissible to interpret it. The court concluded that because plaintiff's job had no connection with the acquisition, management or sale of defendant's capital assets, net profits was limited to those gains derived from the operation of the radio station.

As distinguished from the contract in *Sweeney,* the contract in the case at bench is not fairly susceptible to an interpretation that Ronald was not to receive a share of the profits generated by Ent. The contract expressly provided that he was to receive such a share.

Beth next urges that the practical construction of the contract by the parties demonstrates that Ron was not to receive anything as a result of the profits of Ent. and further demonstrates that Ron received everything he was entitled to. In support of this assertion, Beth refers to evidence that after the first fiscal year under the contract, Roy did not object when he received income only from Inc. and not Ent.

■ "The law is well settled that the construction of a contract as shown by the acts and conduct of the parties prior to the controversy as to its meaning, is entitled to great weight." (*Automobile Salesmen's Union* v. *Eastbay Motor Car Dealers, Inc.* (1970) 10 Cal.App.3d 419, 424 [89 Cal.Rptr. 20].)

■ While such evidence is given great weight, Ron's failure to object when he did not receive his first year's share of the profits from Ent. does

not negate his entitlement to those profits as provided by the express terms of the contract. Where the language of a contract is clear and is not absurd, it will be followed. (*Estate of Wemyss* (1975) 49 Cal.App.3d 53, 59 [122 Cal.Rptr. 134].) Additionally, the unrefuted testimony of Roy was that the subject contract applied to profits resulting from passive investments. Finally, it was not necessary for Ron to receive a distribution of the profits from Ent. in order for Ent. to comply with the contract. Under that contract, Ron's share of the profits could be carried by Ent. as retained earnings as long as Ron received no less than a $30,000 income per year. Consequently, the failure of Ent. to distribute a share of the profits to Ron for a period does not negate his entitlement to those profits.

We, therefore, conclude that the trial court erred in finding that the employment agreement did not entitle Ron to any income from any passive investments or holdings of the Stephenson and Sons corporations.[11]

### ROY'S CROSS-APPEAL

### CONTENTIONS

Roy raises the following contentions on appeal:

1. "The trial court erroneously valued the community property interest in the companies['] pension plans at $547,215.60 rather than at approximately $250,000.00.

2. "The trial court erred in finding that the house that Roy built two years after separation was community property with a value of $525,000.00.

3. "The trial court erred in valuing the companies at $600,000.00.

a. "The court used an improper valuation date for the corporations.

b. "The court failed to compensate Roy for his efforts at the companies for the period August and September, 1980 through July 31, 1981 (or April 30, 1981).

c. "Ron Stephenson's claims against the companies must be deducted against the value of the companies awarded to Roy.

---

[11]To the extent that Ron has stipulated or admitted that he is not entitled to share in the profits generated from certain real properties, he is precluded from seeking such entitlement upon remand to the trial court.

4. "$65,000.00 of Beth's attorney's fees and costs were wrongfully charged to the separate property of Roy."

I

Roy first contends that the trial court erroneously valued the community property interest in the Stephenson corporations' pension fund at $547,215.69, rather than at approximately $250,000.

At the time that Roy and Beth separated, Roy had two pensions, each of which applied to both of the Stephenson and Sons corporations. The first pension was a "money purchase plan" under which the corporations deposited a fixed amount each year. It was started when the Stephenson and Benz corporations were dissolved and the Stephenson and Sons corporations were formed. Roy does not dispute that the funds in that plan at the date of separation as well as the earnings on those funds up to the date of trial were community property.

The second of Roy's pensions was a "defined benefit plan" under which the amount of benefits to be paid at retirement was defined from the plan's beginning.

The referee found that "[t]he value of the interest of Respondent in the Stephenson & Sons, Inc. and Stephenson & Sons Enterprises, Inc. Pension Plans is determined, based on the accrued benefit valuation, to be $519,509.00 as of May 15, 1981 [the trial date], together with the increased value thereof subsequent to May 15, 1981, in the sum of $27,706.66."

Clyde Lonergan, an actuarial expert, testified on behalf of Beth. He initially calculated the value of Roy's pension using the accrued benefit or actuarial method. He concluded that as of April 1979, when the parties separated, the money purchase plan had an attained value of $186,009 and the defined benefit plan had a value of $280,000, equaling $466,009 plus interest for a total of $512,610. Mr. Lonergan also testified what Roy's interest in both pension plans would be using the asset method of valuation. In this method, a pension is valued by looking to the assets in a pension at the date of separation adding to that only interest which accrued after separation. He calculated that using this method Roy's interest in both plans was $519,509.

"Under California law, retirement benefits earned by a spouse during a marriage are community property, subject to equal division upon the dissolution of that marriage. (*In re Marriage of Brown* (1976) 15 Cal.3d 838, 842 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164]; Civ. Code,

§ 4800.) [Fn. omitted.] This is true whether the benefits are vested or non-vested, matured or immature." (*In re Marriage of Gillmore* (1981) 29 Cal.3d 418, 422 [174 Cal.Rptr. 493, 629 P.2d 1].) "Trial courts have considerable discretion to determine the value of community property and to formulate a practical way in which to divide property equally." (*Id.*, at p. 423.)

Roy attacks the trial court's determination upon two bases. First, he seeks to discredit the testimony of Mr. Lonergan by urging that it is contradictory, confusing and therefore not sufficient to support the trial court's finding.

Roy offered no evidence of the actuary value of the defined benefit pension, and chose not to cross-examine Beth's actuarial expert.[12] Accordingly, "[i]t was not unreasonable for the trial court to adopt the figures arrived at by the expert witness in the absence of any evidence indicating that the witness' assumptions and calculations were incorrect." (*In re Marriage of Kasper* (1978) 83 Cal.App.3d 388, 391 [147 Cal.Rptr. 821].)

While the referee stated in his findings that he valued the plans by using the accrued benefit method and the record clearly indicates that this was his intention, he adopted the figure Mr. Lonergan arrived at by using the asset method of valuation. Upon remand, the trial court shall correct this inconsistency.

Roy urges that the trial court erred because the only asset in the defined benefit plan at the time of separation was an annuity that had been purchased for $35,760. Accordingly, he asserts that any value of the pension plan above the premium purchase price of the annuity, and the interest thereon, was his postseparation earnings and was, therefore, his separate property.

This assertion fails to take into consideration that it was within the trial court's discretion to value the plan by using the accrued benefit (actuarial) method. (See *In re Marriage of Kasper, supra,* 83 Cal.App.3d 388, 391-392.) In a defined benefit plan "the company obligates itself to pay a specified monthly pension at retirement. The company contributes to the pension fund in advance of retirement, in order to reduce its financial strain when the employee retires. But while an employee is still working, there is not necessarily a portion of that fund which is allocated to him. The employee's present interest is not derived from the value of the pension fund, but is derived from the amount of monthly pension promised at retirement.

---

[12]We note that Roy's counsel on appeal did not participate in the proceedings in the trial court.

[¶] . . . . [¶] The valuation of a participant's interest in his defined benefit retirement plan is . . . possible, by first determining the value of the pension measured at the future retirement date, and then discounting that value back to the present date of valuation. It is this discounting procedure, reducing a future payment to its present value, that is the basis for the valuation of a present interest in a defined benefit retirement plan. [¶] The discounting procedure usually involves discounting for three separate factors, with the final present values reflecting the cumulative effect of the three factors taken into consideration. [¶] These three factors are: (a) discounting for interest; (b) discounting for mortality; and (c) discounting for vesting, if the participant was not 100% vested in his retirement benefits at the time of valuation." (Projector, *Valuation of Retirement Benefits in Marriage Dissolutions* (1975) 50 L.A. Bar Bull. 229, p. 231; see also Difranza & Parkyn, *Dividing Pensions on Marital Dissolution* (1980) 55 State Bar J. 464; Hardie, *Pay Now or Later: Alternatives in the Disposition of Retirement Benefits on Divorce* (1978) 53 State Bar J. 106.)

Roy urges that the actuarial method is improper in the case at bench because the value of the subject pension upon fruition will depend almost entirely upon the postseparation contributions to that plan by the Stephenson and Sons corporations, which were awarded to Roy upon the division of the community. Therefore, any increase in value of the plan is his separate property.

Mr. Lonergan testified, however, that he was valuing Roy's future right to receive his pensions as of the date of separation, adding only interest which had accrued since separation. This was the proper method of valuation. (*In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 428 [181 Cal.Rptr. 910]; *In re Marriage of Behrens* (1982) 137 Cal.App.3d 562, 577 [187 Cal.Rptr. 200].) If the Stephenson and Sons corporations' preseparation contractual obligation to pay Roy a defined benefit pension diminished the value of those community property corporations, then that should have been considered in valuing those corporations. It does not render erroneous the valuation of the community's pension rights.

It does appear, however, that Mr. Lonergan employed one incorrect assumption in calculating that portion of the defined benefit plan which is community property. He initially testified that the present value of Roy's receipt, upon retirement, of the sum of $5,500 per month for life under the subject plan was either $680,000 or $684,000. He then calculated that the plan would exist 17 years prior to Roy's retirement, and that 7 of those years were prior to Roy and Beth's separation. Accordingly, he concluded that the community had a $7/17$ interest in the value of the plan.

The record is devoid of evidence, however, as to exactly when that plan began. It does appear that it was sometime after 1977. This renders erroneous the foregoing calculation.[13] We, therefore, remand this matter to the trial court to take further evidence as to what portion of the life of the defined benefit plan occurred prior to separation and to adjust its award based upon that calculation.

## II

Roy next contends that "the trial court erred in finding that the house that [he] built two years after separation was community property with a value of $525,000.00."

On November 6, 1980, Roy executed a promissory note "Secured by Obligor's Interest in Stephenson & Sons, Inc. Pension Plan Trust" through which he borrowed $172,000 from that trust to buy the subject parcel of real property. Thereafter, he began to construct a house on that lot. The referee found:

"The land and improvements consisting of the residence at 1010 Chautauqua, Santa Monica, California . . . is determined to have a fair market value of $525,000.00 ($323,000.00 after reduction for Pension loan of $202,000.00). This property is unencumbered."

 Roy urges that the trial court erred in finding the lot to be community property because he acquired it after the interlocutory judgment of dissolution was rendered. Roy purchased that subject parcel from the Stephenson and Sons corporations using funds he obtained by loans from the pension of those corporations.

 "A presumption exists that the proceeds of a loan acquired during marriage are community property. Said presumption is rebuttable upon a showing that the loan was extended on the faith of existing property belonging to the acquiring spouse." (*In re Marriage of Stoner* (1983) 147 Cal.App.3d 858, 864 [195 Cal.Rptr. 351]; *Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202, 210 [259 P.2d 656].) This presumption applies to debts incurred after separation, and an unpaid creditor of a postseparation loan may therefore be entitled to recover against the community. (1 Markey, Cal. Family Law: Practice and Procedure (1984) Community Property, § 5.71[4], pp. 5-104–5-105.)

---

[13]Roy urges that the evidence shows that the defined benefit plan began on October 1, 1978. In support of this assertion, he refers to a 1979 tax return for the "money purchase plan." That plan, however, is the plan which was "rolled over" from the Stephenson and Benz Corporation and is not the defined benefit plan.

If the proceeds of a loan are determined to be a postseparation accumulation, however, they will be deemed to be a separate property of the borrowing spouse. (§ 5118.) The term accumulation "applies 'to any property which a person acquires or retains' except for property obtained in exchange for community property or community funds." (*In re Marriage of Wall* (1972) 29 Cal.App.3d 76, 79 [105 Cal.Rptr. 201].) If a postseparation loan is "unrelated" to the community, then the courts have uniformly held the borrowing spouse solely liable for the debt. (*In re Marriage of Hopkins* (1977) 74 Cal.App.3d 591, 600 [141 Cal.Rptr. 597]; *In re Marriage of Munguia* (1983) 146 Cal.App.3d 853, 862 [195 Cal.Rptr. 199]; *In re Marriage of Lister* (1984) 152 Cal.App.3d 411, 419 [199 Cal.Rptr. 321].) Accordingly, the proceeds of a postseparation loan will be the separate property of the borrowing spouse if it is not obtained in exchange for community property and is, therefore, unrelated to the community.

 Roy urges that his loan from the pension meets this test because: (1) "the separate property which secured the loan from the pension plans were the contributions made to the plan and retained in the plan" and (2) because as a result of this loan being postseparation his creditor could only look to his postseparation earnings to pay the loan, which earnings are his separate property. (§ 5118.)

In support of this assertion, Roy refers to the subject note as evidence sufficient to rebut the presumption that the proceeds of the loan were community property. That note, however, contains no provision that the creditor would look solely to Roy's separate property nor does Roy refers us to any other evidence in the record so limiting the creditor.

The trust, whose res was comprised largely of community property, made a postseparation loan to Roy so that he could buy real property from a community property owned corporation. The loan proceeds are, therefore, sufficiently related to the community so as not to be a postseparation accumulation within the meaning of section 5118. We, therefore, reject Roy's contention to the contrary.

Roy next contends that the trial court erred by failing to find that at least a portion of the house constructed on the lot was his separate property. Roy urges that $30,000 of the funds used to construct the house were borrowed from the Stephenson and Sons corporations' pension trust and was, therefore, his separate property.

The evidence with respect to this loan is identical to the $172,000 loan previously discussed. We, therefore, reject this assertion for the same reasons discussed above.

Roy next urges that $65,000 of the funds used to construct the house were the proceeds of a loan that he and Beth had made to the Stephenson and Sons corporations. Roy admits that that loan was a community asset but asserts that he accounted for the loan payments in a manner such that only his share of the community property was used to build the house. Roy thereby urges us to adopt a rule whereby one spouse, through a bookkeeping entry could divide community property without the consent or knowledge of the other spouse and without a court order.

A similar issue was presented in *In re Marriage of Mason* (1979) 93 Cal.App.3d 215 [155 Cal.Rptr. 350], wherein the husband purchased an automobile which he gave to his wife as her separate property. One month later, he purchased an automobile for himself with community property funds. He urged that through this arrangement his car became his separate property. The appellate court in rejecting this assertion concluded that "there is no authority for the proposition that husband could unilaterally decide to hold property as his separate property by making a gift of similar property to his spouse." (*Id.*, at p. 224.)

We, too, conclude that one spouse cannot unilaterally divide community property by a decision to account as "his and hers" the proceeds of a loan which was made by the community. To allow such a division would circumvent the rules allowing the parties to divide the community by agreement. It would also allow one spouse to use a community asset for the benefit of his separate property, in contravention to the rule that one spouse cannot use community property to enhance his separate property. (*Bare* v. *Bare* (1967) 256 Cal.App.2d 684, 689 [64 Cal.Rptr. 335].) Finally, it would create an untenable situation whereby one spouse could determine the nature of the property at issue by his hidden intentions, which intentions could be divulged when advantageous to that spouse and kept secret when they are not. We, therefore, reject this contention.

Roy next urges that "the evidence was clear that [he] used a substantial part of his post-separation earnings from companies of at least $180,000 for 1979 and $111,000 for 1980 to build his home." While the postseparation earnings of Roy are his separate property they must be traced to the building of the house in order to make that house his separate property. The mere fact that those funds were available to Roy to build that house is not sufficient, absent such tracing, to convert that house into his separate property. (*Estate of Murphy* (1976) 15 Cal.3d 907, 917-918 [126 Cal.Rptr. 820, 544 P.2d 956].) We reject this assertion because Roy has failed to trace his postseparation earnings to the building of the subject house.

Roy finally asserts that "whether or not the trial court found portions of the lot and improvement thereon to be community property, it should have

apportioned a part of the improvement to [him] as his separate property to reflect his post-separation efforts."

In support of this assertion, Roy relies on *In re Marriage of Sparks* (1979) 97 Cal.App.3d 353 [158 Cal.Rptr. 638], wherein the wife used separate property funds to build a house on community real property. Upon the dissolution of the marriage, the trial court awarded wife as her separate property the value of the house including its appreciation during marriage. The appellate court concluded that the trial court did not abuse its discretion by making such an award, because there was no evidence that the appreciation in the value of the house was due to the wife's efforts during marriage, which efforts would be community property.

Roy urges that in the case at bench the value of the subject residence was in part due to his postseparation efforts which efforts were his separate property. While Roy testified that Stephenson and Sons handled the building of the residence differently than other jobs, thereby implying he played a larger part in its construction, there is insufficient evidence of exactly how Roy's postseparation efforts contributed to the construction of that residence. We, therefore, conclude that the trial court did not abuse its discretion by not awarding Roy a separate property interest in the subject residence to compensate him for his postseparation efforts.

### III

### A

Roy next contends that "the trial court erred in valuing the companies at $600,000.00." He initially urges that the court erroneously used July 31, 1981, as the valuation date instead of April 30, 1981, thereby resulting in an increased value of $50,000.

Section 4800, subdivision (a) provides in pertinent part that for purposes of dividing the community or quasi-community property the trial court "shall value the assets and liabilities as near as practicable to the time of trial, except that, upon 30 days' notice by the moving party to the other party, the court for good cause shown may value all or any portion of the assets and liabilities at a date after separation and prior to trial to accomplish an equal division of the community property and the quasi-community property of the parties in an equitable manner."

The court in *In re Marriage of Olson* (1980) 27 Cal.3d 414, 422 [165 Cal.Rptr. 820, 612 P.2d 910], interpreted this subdivision as legislative recognition "that there may be situations in which both the nature and value

of community property cannot be fixed or ascertained at the precise time of trial. Under these circumstances trial courts are thus permitted a reasonable degree of flexibility in accomplishing substantial justice.''

This flexibility, however, will not result in an affirmance of the trial court's valuation in the absence of substantial evidence to support it. While there is considerable evidence to support the trial court's valuation as of April 30, 1981, the record is devoid of evidence which would support a valuation as of July 31, 1981.[14]

It would be pure speculation for us to conclude that the trial court's valuation would be the same if it had based it upon an April 30 valuation date. We, therefore, remand this matter to the trial court to determine what the value of the Stephenson and Sons corporations were as of April 30, 1981, based upon the existing evidence.

B

Roy next contends that "the court failed to compensate [him] for his efforts at the companies for the period August and September, 1980 through July 31, 1981 (or April 30, 1981).'' Roy urges that the evidence was that as of April 30, 1981, only $9,000 in salaries had been paid him for this period and that he received no salary between April 30 and July 31, 1981. He asserts that this resulted in an over valuation of the companies which were awarded to him upon the division of the community.

The referee found that "[t]he fair market value of the businesses determined as of July 31, 1981 is the sum of $600,000. Upon the final determination and payment of claims against said businesses arising prior to July 31, 1981, made by union to which the employees of said businesses are members or made by third parties by reason of accidents or injuries which are not fully insured by said businesses, [Beth] shall . . . pay fifty percent (50%) of the net amount thereof to the extent that such amount materially affects the net worth of the businesses.''

 Roy's postseparation earnings from the companies were his separate property and therefore should have been deducted from the value of the community property corporations to the extent they were unpaid. (§ 5118.)

Roy objected to the referee's finding upon the ground that it failed to deduct from the value of those companies his unpaid separate property earn-

---

[14]Beth's reference to unreported court sessions on July 8th, 11th and August 6th, will be disregarded as she has not followed the proper procedure to include those in the record on appeal. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 404, p. 4373.)

ings. We are unable to determine from the above quoted finding whether the referee considered any salaries the companies owed Roy in valuing them.

"In the circumstances of record and under the law as it existed at the time of trial, [Roy] was entitled to findings of fact which would 'fairly disclose the court's determination of all issues of fact in the case.' (Former Code Civ. Proc., § 632 [request for findings; subsequently amended to replace findings and conclusions with a 'statement of decision' procedure (Stats. 1981, ch. 900, § 1, p. 3425)]; [citations].) In general, a failure to make required findings was reversible error." (*In re Marriage of Behrens, supra,* 137 Cal.App.3d 562, 568; see also *In re Marriage of Davis* (1983) 141 Cal.App.3d 71 [190 Cal.Rptr. 104].)

We remand this matter to the trial court to determine whether at the time of trial the Stephenson and Sons corporations owed Roy any salary he had earned after separation and, if so, whether this affected the valuation of those corporations.

### C

Roy next urges that "Ronald Stephenson's claims against the companies must be deducted against the value of the companies awarded to Roy." Upon remand, the trial court should consider the amounts, if any, each of the two corporations owed Ron as of April 30, 1981, in valuing those corporations.

### IV

Roy next contends that $65,000 of Beth's attorney's fees and costs were wrongfully charged to the separate property of Roy.

After all parties had presented their cases-in-chief, Beth's attorney submitted a declaration in which he stated that he expended not less than 1,870 hours in handling this matter prior to the commencement of trial, not less than 500 of which hours were expended because of Roy's recalcitrance.

Roy does not dispute the reasonableness of the time spent by Beth's counsel but instead urges that the trial court erred by adopting the finding of the referee "that by reason of the lack of reasonably-to-be-expected co-operation by the Respondent, Counsel for Petitioner was required to expend additional time and costs and that by reason thereof the Petitioner's attorney's fees in the sum of $50,000.00 and costs expended in the sum of $15,000.00 should be paid from Respondent's separate property."

■ "Generally, a court may properly award attorney's fees only pursuant to an agreement of the parties or statutory authority. This principle is codified in Code of Civil Procedure section 1021: 'Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . .'" (*Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 634 [150 Cal.Rptr. 461, 586 P.2d 942].) The record on appeal contains no evidence that the parties entered into an agreement respecting attorney's fees. The recovery of attorney's fees in dissolution proceedings is governed generally by section 4370 which provides in pertinent part: "(a) During the pendency of any proceeding under this part, the court may order any party, except a governmental entity, to pay such amount as may be reasonably necessary for the cost of maintaining or defending the proceeding and for attorneys' fees; and from time to time and before entry of judgment, the court may augment or modify the original award for costs and attorneys' fees as may be reasonably necessary for the prosecution or defense of the proceeding or any proceeding related thereto, including after any appeal has been concluded."

■ "The mere fact that Civil Code section 4370 makes reference to an award of attorney fees pendente lite does not preclude the awarding of such fees pursuant to its provisions as a part of a final judgment." (*In re Marriage of Popenhager* (1979) 99 Cal.App.3d 514, 524-525 [160 Cal.Rptr. 379].)

■ "Absent a clear abuse of discretion, a reviewing court may not disturb a trial court's decision on the matter of attorney fees [citation]. In exercising its discretion to award attorney fees under Civil Code section 4370, a trial court must consider the respective incomes and needs of a husband and wife [citation]." (99 Cal.App.3d at p. 525.)

■ "The court in making an award of attorneys' fees is entitled to consider the entire litigation [, however,] and not merely the relative incomes of husband and wife. [Citation.] There must be evidence to show the wife's need of money for that purpose, but the fact she has separate property does not necessarily negate this need. '[A] wife is not required to impair the capital of her separate estate in order to defray her litigation costs. [Citations.]'" (*In re Marriage of Lister* (1984) 152 Cal.App.3d 411, 420 [199 Cal.Rptr. 321], quoting *In re Marriage of Jafeman* (1972) 29 Cal.App.3d 244, 264 [105 Cal.Rptr. 483].)

Prior to the referee making the above finding, Roy objected, urging that Beth "is financially capable of paying her own fees and costs." Accordingly, we may not infer on appeal that the trial court found in favor of Beth

regarding her financial capabilities because it failed to make a finding on that issue. (Code Civ. Proc., § 634; *In re Marriage of Harris* (1976) 65 Cal.App.3d 143, 148-149 [134 Cal.Rptr. 891].) Beth does not address the question of the respective financial capabilities of the parties to pay their fees but instead urges that "[t]o require the husband to pay for his 'lack of reasonably to be expected cooperation' is simply an extension of the principle requiring the party guilty of dissipating community assets to face responsibility for his or her conduct."

In support of this assertion, Beth relies on *In re Marriage of Lister, supra,* 152 Cal.App.3d 411, wherein the appellate court upheld the trial court's award ordering the husband to pay the wife's attorney's fees. Initially, the court did so upon its determination that the "wife was working, and had custody of two small children. Her expenses, including her mortgage payments, were substantially in excess of her income. On the other hand, the evidence suggested that husband enjoyed substantial unreported income in addition to that disclosed on his financial statement. This evidence established wife's need, and husband's ability." (*Id.,* at pp. 420-421.)

The court went on to conclude, however, that "because wife incurred substantial attorney's fees in investigation [of husband's transactions] the true character of which husband had misrepresented or withheld from her. The court in the exercise of its sound discretion made the award of the attorneys' fees to equalize an otherwise unjustly disproportionate division of obligations."

Nothing in the record in the case at bench, however, supports Beth's assertion that the trial court's award was to "equalize an otherwise unjustly disproportionate division of obligations." While the attorney's fees the wife incurs as a result of the husband's dilatory tactics is an appropriate consideration in determining the amount of an award (see *Warner* v. *Warner* (1950) 34 Cal.2d 838, 842 [215 P.2d 20]), it is not sufficient to justify their award in the first instance. Such an award must be based solely on the respective abilities of the parties to pay. (2 Markey, Cal. Family Law: Practice and Procedure (1984) Attorney's Fees and Costs, § 25.12[1][a], pp. 25-29.)

Contrary to Beth's characterization, an award of attorney's fees based solely upon the recalcitrance of a party is in the nature of a sanction. The legislative enactment of Code of Civil Procedure, section 128.5, effective January 1, 1982, is designed to govern such a situation. At the time of this trial, however, that section was not yet effective. Prior to its enactment our Supreme Court in *Bauguess* v. *Paine, supra,* 22 Cal.3d 626, 638, determined that absent statutory authorization, a trial court has no inherent power

to award attorney fees in order to punish misconduct. Clearly this is what the trial court did here. We, therefore, conclude that the trial court erred in finding that Roy should pay $65,000 of Beth's attorney's fees and costs from his separate property. Upon remand, the court should make these costs and fees a community obligation.

The judgment is affirmed in part and reversed in part. The matter is remanded to the trial court with directions to:

1. Award to claimants only that community property which is traceable to those UGMA accounts of which Beth was custodian. In making this award only the named donee of each of the accounts is entitled to that property traced to his or her account. It shall be Beth's burden to trace property to the custodial accounts of which Roy was custodian in order for the court to void those transactions.

2. Award nothing to Cathy Sonnenberg.

3. Award to Ron his share of the profits which the court determines were earned by the passive investments and holdings of the Stephenson and Sons corporations during the term of his employment contract. Furthermore, the court should consider any amounts those corporations owe Ron in valuing them.

4. Correct the inconsistency with respect to the method the court employed in valuing Roy's interest in the pensions.

5. Upon receipt of additional evidence, redetermine what percent of the life of Roy's defined-benefit pension occurred prior to Roy and Beth's separation and adjust its determination of the community property interest in that pension based upon that reformulation.

6. Value the Stephenson and Sons corporations as of April 30, 1981.

7. Determine whether at the time of trial the Stephenson and Sons corporations owed Roy any salary he earned after his separation from Beth and if so the effect this has on the valuation of those corporations.

8. Redetermine the total net value of community property after the adjustment of the above items.

9. Order the $65,000 of Beth's attorney's fees and costs, which the court ordered paid from Roy's separate property, be paid from the community property.

Each party to bear their own costs on appeal.

Woods, P. J., and Arguelles, J., concurred.

A petition for a rehearing was denied January 17, 1985, and the opinion was modified to read as printed above. The petitions of appellants Wife and Husband for a hearing by the Supreme Court were denied February 27, 1985.